1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 22-cr-00007-RMR
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
   vs.
6
   THOMAS MAURICE GRANT,
7
        Defendant.
8
   _____

9
                     **REPORTER'S TRANSCRIPT**
10                    MOTION TO SUPPRESS
   _____
11
12          Proceedings before the HONORABLE REGINA M. RODRIGUEZ,

13   Judge, United States District Court for the District of

14   Colorado, commencing at 10:10 a.m., on the 25th day of October,

15   2022, in Courtroom A901, United States Courthouse, Denver,

16   Colorado.

17                    **A P P E A R A N C E S**

18          THOMAS JOHN MINSER and DANIEL WILSON WARHOLA,

19   Assistant U.S. Attorneys, 1801 California Street, Suite 1600,

20   Denver, Colorado, 80202, appearing for the Government.

21          KATHRYN STIMSON, Attorney at Law, Stimson LaBranche

22   Hubbard LLC, 1652 Downing Street, Denver, Colorado, 80218,

23   appearing for the Defendant.

24                THERESE LINDBLOM, Official Reporter
                901 19th Street, Denver, Colorado 80294
25           Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

1                          **P R O C E E D I N G S**

2                (In open court at 10:10 a.m.)

3                *THE COURT:*  Good morning, everyone.  Please be seated.

4                All right.  So we're here on Mr. Grant's motion to

5     suppress evidence and request for hearing.

6                Good morning, Mr. Grant.  Good to see you again.

7                *THE DEFENDANT:*  Good morning, Your Honor.

8                *THE COURT:*  All right.  Could I have appearances by

9     counsel, please.

10               *MR. MINSER:*  Good morning, Your Honor.  Thomas Minser

11    and Dan Warhola for the United States.

12               *THE COURT:*  Good morning.

13               *MR. WARHOLA:*  Good morning, Your Honor.

14               *MS. STIMSON:*  Good morning, Your Honor.  Kate Stimson

15    appearing with Mr. Grant, who is seated to my left.

16               *THE COURT:*  Good morning.

17               All right.  So we're here on the motion to suppress

18    evidence and a request for hearing.  I assume we have witnesses

19    here this morning?

20               *MR. MINSER:*  We do, Your Honor.  They're both outside.

21               *THE COURT:*  All right.  Well, just for a little

22    background for the record, on January 4, Mr. Grant was charged

23    by Indictment on one count of possessing a firearm as a

24    prohibited person, in violation of 18 U.S.C. Section 922(g)(1);

25    and on January 26, Mr. Grant pled not guilty to the charge in

1    the Indictment.  Since that time, Judge Neureiter ordered that

2    Mr. Grant be committed to custody pending the disposition of

3    this matter.

4           On February 10, Mr. Grant filed an unopposed motion to

5    exclude 120 days from the Speedy Trial Act calculation and then

6    to continue the motions filing date.  That motion was granted.

7    And since that time also we've had a change in counsel, and we

8    now have new counsel on this matter.  Ms. Stimson entered her

9    appearance on behalf of Mr. Grant in July of 2022.  We have

10   since also granted three motions to exclude time from the

11   Speedy Trial Act calculation.

12          It appears that we're now set for a four-day trial

13   on -- to begin on November 14; is that right?

14          Everybody on the same page on that?

15          *MR. MINSER:*  Yes, Your Honor.

16          *MS. STIMSON:*  Yes.

17          *THE COURT:*  All right.  Good.

18          So we do have a trial prep conference in this matter,

19   a change of plea hearing set for November 2.

20          So we have before us in advance of that this motion to

21   suppress.  I set today's hearing based on the motion; and I do

22   have the Government's response, which was filed at ECF 38.  I

23   take it that we don't have a witness list from the defendants,

24   but I did get a request for the issuance of a subpoena.  That

25   issue -- that subpoena did issue.

1          Was Mr. Vazquez-Euresti able to be served with that

2   subpoena?

3          MS. STIMSON:  He was not.  And the defense does not

4   intend to call any witnesses.

5          THE COURT:  All right.

6          Well, as I understand it from a review of the briefing

7   in this matter, Mr. Grant concedes that there was reasonable

8   suspicion for law enforcement to conduct the initial

9   investigatory detention because the attempt to locate

10  Mr. Vazquez-Euresti -- I'm not sure if I'm pronouncing this

11  name correctly; so if somebody knows how to pronounce it better

12  than I do, please feel free to correct me -- but they were

13  trying to locate Mr. Euresti and determine his association with

14  the Ford Fusion.

15         Similarly, Mr. Grant does not challenge

16  Agent Anderson's order for him to get out of the car.  As I

17  understand the briefing, the sole issue in dispute in this

18  matter is whether after the initial investigatory detention and

19  order for Mr. Grant to get out of the car, whether handcuffing

20  Mr. Grant was reasonably related in scope to the circumstances

21  that justified the intrusion in the first place.

22         And this really surrounds the confirmation of the

23  identity of Mr. Euresti.  There were two passengers in the

24  vehicle.  According to Mr. Grant, Agent Anderson either was

25  able to identify Mr. Euresti, as Mr. Euresti identified

```
 1   himself, as the owner of the Ford Fusion, or that

 2   Agent Anderson had sufficient information about the description

 3   of the owner of the Ford Fusion being a Hispanic male around

 4   200 pounds, that description not matching that of Mr. Grant, as

 5   Mr. Grant describes himself as a 160-pound black male.

 6   Therefore, those descriptions do not match.

 7            So as I understand it, that is really the factual

 8   issue that is in dispute and about which this hearing today

 9   will -- we'll hear evidence on.

10            Is that consistent with everybody's understanding?

11            MR. MINSER:  Generally, yes, Your Honor.

12            MS. STIMSON:  Yes, Your Honor.

13            THE COURT:  Okay.  So we'll go ahead and start with

14   testimony in this case, but I am happy to hear any statement

15   that either side would like to make in opening.  And if you

16   want to waive that, I will be happy to do that, as well.

17            Counsel for either side?

18            MR. MINSER:  Your Honor, the Government will waive.

19            THE COURT:  All right.

20            MS. STIMSON:  I think the Court accurately identified

21   the issue for today; so I think I will waive, as well.

22            THE COURT:  All right.

23            Well, call your first witness.

24            MR. MINSER:  Yes, Your Honor.  I guess before I call a

25   witness, I would seek to admit, just housekeeping, Exhibit 1,
```

1    which is the certified copy of the arrest warrant for

2    Mr. Vazquez-Euresti, just to shore up the record, because,

3    obviously, ATL is such a big portion of this hearing.  That

4    indicates that there was, in fact, a valid arrest warrant for

5    Mr. Vazquez-Euresti at the time the ATL was being executed.

6              THE COURT:  Okay.

7              MS. STIMSON:  No objection.

8              THE COURT:  All right.

9              MR. MINSER:  The Government's first witness is

10   Agent Anderson.

11             THE COURT:  I want to make sure I have -- I have the

12   notebook with exhibits.  And Exhibit 1, the arrest warrant --

13   got it.

14             Hello, sir.  Would you please stand right there, raise

15   your right hand, and Ms. Myhaver is going to swear you in.

16             (**TABER ANDERSON, GOVERNMENT'S WITNESS, SWORN**)

17             COURTROOM DEPUTY:  Please state your name and spell

18   your first and last name for the record.

19             THE WITNESS:  My name is Taber Anderson.  My first

20   name is spelled T-A-B-E-R.  Last name is A-N-D-E-R-S-O-N.

21             THE COURT:  Thank you.

22             MR. MINSER:  May I proceed, Your Honor?

23             THE COURT:  Yes.

24

25

**DIRECT EXAMINATION**

1

*BY MR. MINSER:*

2

*Q.*  Sir, what do you do for a living?

3

*A.*  I work for the Lakewood Police Department.

4

*Q.*  In what capacity do you work for the Lakewood Police

5

Department?

6

*A.*  I'm working on patrol, in our patrol division right now.

7

*Q.*  So you're a police officer?

8

*A.*  Yes.

9

*Q.*  How long have you been working in that capacity for the

10

Lakewood PD?

11

*A.*  I was hired in January of 2018, so coming up on five years

12

now.

13

*Q.*  I'm going to direct your attention now to July 28 of 2021.

14

*A.*  Okay.

15

*Q.*  Approximately 9:51 p.m., what was your assignment on that

16

date and time?

17

*A.*  At that time, I was working on patrol, just normal street

18

police officer, conducting actual patrols.

19

*Q.*  When you're on patrol, what area were you patrolling?

20

*A.*  I work along West Colfax Avenue, a very high crime area.

21

*Q.*  So let's take it back a step.  You said 9:51 p.m.  How dark

22

was it outside that day?

23

*A.*  It was completely dark.

24

*Q.*  You mentioned West Colfax.  At around 9:51 p.m., did you

25

Taber Anderson - Direct

1   have the opportunity to observe something unusual?

2   A.  I did.  I observed a car I didn't recognize at the Mesa

3   Motor Inn motel.

4   Q.  So let's take a step back.  The Mesa Motor Inn motel, where

5   is that located?

6   A.  West Colfax and Depew Street.  5600 West Colfax.

7   Q.  Are you familiar with that area?

8   A.  Absolutely.

9   Q.  Are you familiar with that motel?

10  A.  Yes, I am.

11  Q.  Can you explain that?

12  A.  The Mesa Motor Inn is a very high crime area.  I know that

13  for gang activity, narcotics violations, recurring stolen

14  vehicles, shootings, weapons offenses.  Any kind of criminal

15  activity you can think of goes on there.  It is a very -- we

16  get a lot of calls there and a lot of criminal activity in that

17  location.

18  Q.  So you arrived at the Mesa Motor Inn motel.  What did you

19  observe?

20  A.  I saw a white Ford Fusion in the parking lot.  I didn't

21  recognize that car from that location --

22  Q.  Let me stop you right there.  You said you didn't recognize

23  it?

24  A.  Right.

25  Q.  What do you mean by that?

Taber Anderson – Direct

1   A.   I drive -- at that time, I was driving through the motel

2   every single day, so I would recognize the cars from long-term

3   residents, the owners, you know, anything that has been there

4   for an extended period of time.   So when I drive through and I

5   see a car I don't recognize, that catches my attention.

6   Q.   Why were you getting familiar with vehicles that were at

7   that location?

8   A.   Like I said, there is a lot of criminal activity there,

9   mainly for recovering stolen vehicles.   If I saw a car there I

10  didn't recognize, there is a possibility it's stolen; so I'll

11  always check into it.

12  Q.   So what happened then?

13  A.   So I ran the license plate on that vehicle, and I was

14  alerted that there was an attempt to locate on that vehicle

15  from Thornton PD.

16  Q.   What is an "attempt to locate"?

17  A.   So an attempt to locate, another agency is pretty much

18  putting out to all of the other agencies in the area that

19  they're trying to locate a specific vehicle or a specific

20  person; and they'll tell you what they're looking for them for,

21  typically.

22  Q.   How do you receive an ATL?

23  A.   So I typed the license plate in on my computer, and then

24  I'll get a blinking red light as soon as I click on that link.

25  It will tell me, attempt to locate.

Taber Anderson - Direct

1   *Q.*  How big is your computer screen?

2   *A.*  It's a typical computer screen.  I can't give you the exact

3   dimensions.  Just a laptop computer.

4   *Q.*  When you get this ATL, you said there is a blinking light.

5   What do you do with the blinking light?

6   *A.*  I click on it, and I read whatever the information is that

7   it's telling me.

8   *Q.*  What did the ATL on July 28, 2021, at 9:51 p.m. indicate?

9   *A.*  It indicated it was looking for that Ford Fusion with the

10  plate that I ran and said there was an officer safety caution.

11  They were looking for a Christopher Vazquez-Euresti and said

12  that there were good felony menacing DV charges and wanted

13  Christopher detained and for us to contact Thornton PD.

14  *Q.*  Did it give a description of the subject of the ATL?

15  *A.*  It did not.

16  *Q.*  Based upon that information, what did you do?

17  *A.*  I turned around, and I initiated a high-risk stop on that

18  vehicle.

19  *Q.*  So I'm going to direct your attention now to Exhibit 2 in

20  that binder.

21  *A.*  Okay.

22  *Q.*  Right in front of you.  If you could flip to it.

23  *A.*  Okay.

24  *Q.*  Do you recognize Exhibit 2?

25  *A.*  Yes.

Taber Anderson – Direct

1  *Q.*  What is Exhibit 2?

2  *A.*  That is an overhead picture of the Mesa Motor Inn motel.

3  *Q.*  Does Exhibit 2 truly and accurately depict how that area

4  looked on July 28, 2021, at approximately 9:51 p.m.?

5  *A.*  Other than it being daylight, yes.

6       *MR. MINSER:*  All right.  The Government would now seek

7  to admit Exhibit 2.

8       *MS. STIMSON:*  No objection.

9       *THE COURT:*  Exhibit 2 is admitted.

10       (Exhibit 2 admitted.)

11  *BY MR. MINSER:*

12  *Q.*  I'm going to direct you toward that computer screen so you

13  can see a little better.

14  *A.*  Okay.

15  *Q.*  Looking at Exhibit 2, Agent Anderson, can you please draw

16  on Exhibit 2 how you came to be within the Mesa Motor Inn.

17  *A.*  Sure.  Mine is loading, so give me just a second here.

18  *Q.*  Sorry.  Technical difficulties.

19       While we're waiting, Agent Anderson, let's talk about

20  how you arrived on scene.

21  *A.*  Okay.

22  *Q.*  So how did you arrive to the Mesa Motor Inn hotel?

23  *A.*  So I was driving on Depew Street –– I don't remember if I

24  was driving north or south –– but there is an entrance at the

25  southeastern portion of the motel.  I entered through that

1   entrance.

2   Q.  And when you entered, approximately where was this vehicle?

3   A.  Excuse me.  So the vehicle was on the western part of the

4   motel, in a parking space, and the vehicle was pulled in

5   forward facing west.

6   Q.  So when you were pulling by, how close were you?

7   A.  I was very close.  There is not a lot of room in that motel

8   to maneuver a vehicle very easy, so I was very close to the

9   car.

10  Q.  So at that point when you had just entered in, is that the

11  point when you first saw the license plate?

12  A.  Yes.

13  Q.  And then once you saw the license plate, what did you do?

14  A.  I ran that plate.

15  Q.  Did you make any observations of who was in the car at that

16  time?

17  A.  Yes.  I couldn't -- just because of how dark it was, the

18  window tint, I couldn't make out, you know, physical

19  descriptors of the people in the car; but I saw there were two

20  people in the vehicle.

21  Q.  Once you saw that there were two people in the vehicle and

22  you're running the plate, what happens next?

23  A.  I get the attempt to locate hit, and the passenger stepped

24  out of the vehicle.

25  Q.  Where were you at this point?

Taber Anderson - Direct

1   *A.* I was driving past the vehicle.  I was probably just a

2   little bit north of it as I was seeing the person get out and

3   looking at this ATL hit on my computer.

4   *Q.* What did you do next?

5   *A.* I read through the hit, saw what it was telling me, that

6   there were officer safety cautions for felony menacing, and

7   then I aired on the radio that I was out with a suspicious

8   vehicle and provided all of that information to dispatch.

9   *Q.* What happened at this point?

10  *A.* When I was turning around, I was able to see the passenger

11  was getting back into the car.

12  *Q.* How far away were you from the vehicle at this point?

13  *A.* It wasn't far.  Maybe 25, 30 yards.

14  *Q.* What did you -- did you do next?

15  *A.* So after I aired it on the radio, I turned around so that I

16  was facing kind of the southwestern orientation, I turned on my

17  emergency lights, and that's when I initiated the high-risk

18  stop.

19  *Q.* Why did you initiate a stop?

20  *A.* Once I saw the passenger was getting back into it, right

21  after I drove by, I believed they were probably going to leave

22  the area.  I didn't want to create any kind of safety issue by

23  attempting to conduct a traffic stop on the open roadway.  In

24  the event that they did run from me, I didn't want to put the

25  public at risk to do that.

Taber Anderson - Direct

1    *Q.*   You mentioned a high-risk stop.

2    *A.*   Right.

3    *Q.*   What made this stop high risk?

4    *A.*   The information in the attempt to locate saying there were

5    good felony menacing DV charges.  I know that for a felony

6    menacing, that typically involves a deadly weapon of some sort,

7    whether it's a gun, knife, baseball bat.  Somebody has

8    threatened another person with a deadly weapon and put them in

9    fear of serious bodily injury.

10   *Q.*   Did you have any of that information as to what weapon was

11   the subject of this felony menacing warrant?

12   *A.*   I did not.

13   *Q.*   And, again, at this point, did you have any physical

14   description of the subject of the ATL?

15   *A.*   I did not.

16   *Q.*   Did the area also play into your decision to make a stop at

17   this point?

18   *A.*   Oh, absolutely.

19   *Q.*   What was that?

20   *A.*   Just because it is extremely high crime.  There were also

21   some children in the parking lot; I didn't want to create a

22   situation where the vehicles were going to back out quickly,

23   hit one of the kids.  And, like I said, it's extremely high

24   crime area.  This is a dangerous area.  I felt like I needed to

25   stop the car at that point.

Taber Anderson – Direct

1   *Q.*  How well lit was the parking lot?

2   *A.*  Not great.  I mean, enough to where, you know, I'm not

3   walking in complete darkness.  But I can tell you the motel

4   isn't very well funded.  They don't have great lighting.  So I

5   can see, but it's not perfect.

6   *Q.*  You mentioned that the passenger of the vehicle was inside,

7   left the vehicle, and then got back in?

8   *A.*  Correct.

9   *Q.*  Do you know where the passenger went?

10  *A.*  I don't.

11  *Q.*  When you initiated the stop, did you believe the subject of

12  the ATL was in the car?

13  *A.*  Yes, I did.

14  *Q.*  Why?

15  *A.*  Because the attempt to locate was associated to the car,

16  not just to the person.  So typically when you put out an ATL,

17  you won't list a vehicle unless that specific person is

18  associated with that car.

19  *Q.*  So at the time you initiate the stop, there is two people

20  in the car.  Is there a person in the driver's seat?

21  *A.*  There was.

22  *Q.*  And there is a person in the passenger seat?

23  *A.*  Yes.

24  *Q.*  At this point, you don't have any physical description.

25  Can you describe to the Court who you believed to be the

Taber Anderson - Direct

1   subject of the ATL?

2   *A.*   I believed it was the driver.

3   *Q.*   So now that you have executed -- you initiated the stop --

4   can you actually describe how you initiated the stop.

5   *A.*   Sure.  So I stopped my vehicle.  I wasn't very far away,

6   maybe 15, 20 yards.  I turn on my emergency lights to clearly

7   identify myself as a police officer; and then I get out, drew

8   my handgun, gave the occupants commands to put their hands up

9   and get out of the vehicle.

10  *Q.*   So when you said you get out of the vehicle, where did you

11  go?

12  *A.*   I stayed by the engine block, the is front door of my car.

13  *Q.*   And when you ordered the occupants out of the vehicle, what

14  happened?

15  *A.*   Both of the occupants were compliant.  I had the driver

16  step out first and had him lay on the ground; and then I

17  ordered the passenger out and laid him right next to the

18  driver.

19  *Q.*   Why did you do that?

20  *A.*   That's how we're trained to do a high-risk stop.  With the

21  information with the felony menacing, I believed there was a

22  weapon in the car, that's the safest way for me to conduct the

23  stop, so they're laying on the ground and in the position where

24  I have the advantage should they want to run, fight, something

25  like that.

Taber Anderson - Direct

1    Q.  Did you approach the occupants at this time?

2    A.  No, not at that time.

3    Q.  Why?

4    A.  Because of how high risk this was, there was nobody else --

5    there was not another officer there to help me, so I need to

6    wait on another officer to do this entire contact as safely as

7    possible.

8    Q.  Were you communicating with dispatch at this point?

9    A.  I was.

10   Q.  What were you communicating?

11   A.  I aired that both the occupants were out of the vehicle,

12   they were compliant, they were proned out on the ground, and

13   then I asked for physical descriptors of the subject of the

14   attempt to locate.

15   Q.  What response did you get when you asked for physical

16   descriptors?

17   A.  I was told the name and the date of birth of the subject of

18   the attempt to locate.

19   Q.  Did that help you in any way figuring out who the subject

20   of the attempt to locate was?

21   A.  Not at all.

22   Q.  Why?

23   A.  I've got two guys in the car.  I believe it's the driver,

24   but there is no descriptors for this person other than just

25   it's Christopher Euresti.

1   Q.   How long did it take until backup arrives?

2   A.   I can't say for sure.  Maybe a minute and a half, two

3   minutes, somewhere around there.

4   Q.   Prior to backup arriving, did you ask any questions of the

5   suspects about who they were?

6   A.   Yeah.  While they were laying on the ground, I asked,

7   "Which one of you is Chris?"

8   Q.   Who responded?

9   A.   The passenger said, "I'm Chris."

10  Q.   What effect did that have on your determination of figuring

11  out who was who?

12  A.   I hadn't verified anybody's identity at that point.  I had

13  no way to verify who was Chris.  I believed it was the driver

14  based on the attempt to locate name, because Christopher -- it

15  was Christopher's vehicle that they were looking for and him in

16  that vehicle.

17  Q.   Why didn't you just believe the passenger?

18  A.   I get lied to on a daily basis about people's names and who

19  they are.

20  Q.   So at that point, a minute and a half you initiate the

21  stop, your backup arrives?

22  A.   Correct.

23  Q.   Who is that?

24  A.   Agent Albrets.

25  Q.   Once --

1        THE COURT:  I'm sorry.  Just a point of clarification.

2   It was the passenger who said that he was Chris?

3        THE WITNESS:  Correct.

4        MR. MINSER:  I apologize, Your Honor.

5        THE COURT:  No.  I wanted to make sure I understood.

6   Sorry for the interruption.

7   BY MR. MINSER:

8   Q.   Once Agent Albrets arrives, where does he park his vehicle?

9   A.   He parks his vehicle on the passenger side of my car.

10  Q.   How far away?

11  A.   Maybe 10 feet.  Pretty close.

12  Q.   And once he arrives, what do you do?

13  A.   Then we communicate that we're going to go up, we're going

14  to place both subjects in handcuffs, make sure the car is

15  empty, there is nobody else in there, and then we can work on

16  the investigation.

17  Q.   Why are you planning on placing the subjects in handcuffs?

18  A.   Based on the attempt to locate hit, like I said before, you

19  know, there is a high likelihood that one of them has a weapon.

20  They're both in the vehicle, we haven't verified anybody's

21  identity yet to verify who Chris is, who possibly has the

22  weapon.  We're typically trained, in a high-risk stop, the

23  scene needs to be safe first.  Everybody is going to be

24  detained until we are sure that everything is safe; and then we

25  can start to do the investigation, once we have eliminated any

Taber Anderson – Direct

 1  safety risk.

 2  *Q.*  Is it pretty immediate when Agent Albrets gets on scene

 3  that you approach the subjects?

 4  *A.*  Yes, almost immediately.

 5  *Q.*  How do you approach the subjects?

 6  *A.*  Typically, one person is going to stay with their handgun

 7  drawn and cover both of the subjects and the vehicle while the

 8  other is handcuffing one of the suspects.

 9  *Q.*  Is that what occurred here?

10  *A.*  Yes.

11  *Q.*  Which subject did you approach first?

12  *A.*  I believe it was Christopher Euresti, if I recall

13  correctly.

14  *Q.*  You're saying Christopher Euresti?

15  *A.*  Yes.

16  *Q.*  Who you later found out to be Christopher Euresti?

17  *A.*  Correct.

18  *Q.*  At this point, is this the passenger of the vehicle?

19  *A.*  Yes.

20  *Q.*  And when you approached the passenger of the vehicle, what

21  did you do specifically, and what did Agent Albrets do

22  specifically?

23  *A.*  If I recall correctly, I was -- I still had my gun out.  I

24  was providing cover for Agent Albrets, watching both of the

25  suspects and the vehicle, while Agent Albrets was handcuffing

Taber Anderson - Direct

1   who we later found out was Christopher Euresti.

2   Q.  How long did that take?

3   A.  Ten seconds.  It's pretty quick.

4   Q.  What happened next?

5   A.  At that point we placed handcuffs on Mr. Grant and detained

6   him.

7   Q.  Who placed handcuffs on him?

8   A.  I did.

9   Q.  How far away from Mr. Grant was the passenger, Mr. Euresti?

10  A.  Very close.  Every time I do a high-risk stop, I have

11  people lay down right next to each other.

12  Q.  After both of the subjects were handcuffed, then what did

13  you do?

14  A.  The vehicle was checked to confirm there were no other

15  occupants, to make sure the entire scene was safe, and then we

16  started the investigation.

17  Q.  How long did the vehicle check take?

18  A.  Seconds.

19  Q.  Once the vehicle was checked, where did Agent Albrets go?

20  A.  Agent Albrets went back to Mr. Euresti.

21  Q.  Where did you go?

22  A.  I went back to Mr. Grant.

23  Q.  When you approached Mr. Grant -- actually, I'll stop you

24  there.  Now that we have the map up --

25  A.  Correct.

Taber Anderson - Direct

1    Q.   -- if you could look at Exhibit 2, please.

2    A.   Yes.

3    Q.   If you could draw --

4         COURTROOM DEPUTY:  Our annotation isn't working.  IT

5    is coming up to try to reboot it.

6         MR. MINSER:  Thank you very much.

7    BY MR. MINSER:

8    Q.   I'd like to direct your attention now, actually, to

9    Exhibit 3 in the binder.

10   A.   Okay.

11   Q.   3.

12   A.   I've got it.

13   Q.   If you could also check out Exhibit 4 and 5 too.

14   A.   Okay.

15   Q.   Do you recognize those photos?

16   A.   Yes.

17   Q.   What are those photographs of?

18   A.   The photographs, Exhibits 4 and 5, are pictures of the

19   vehicle -- the Ford Fusion with the license plate that I ran

20   that had the attempt to locate hit on it.

21   Q.   Actually, instead of Exhibit 3 -- I'm sorry -- Exhibit 6.

22   A.   6.  And, yes, I recognize Exhibit 6.

23   Q.   What is that a photograph of?

24   A.   That is the photograph roughly where Mr. Grant was laying

25   when I took him into custody and all of the items that I found

Taber Anderson - Direct

1  on his person in his pockets and in his pants.

2  Q. And do Exhibits 4, 5, and 6 truly and accurately depict

3  what you just described?

4  A. Yes.

5      MR. MINSER:  Your Honor, the Government would seek to

6  admit Government Exhibits 4, 5, and 6.

7      MS. STIMSON:  No objection.

8      THE COURT:  All right.  Exhibits 4, 5, and 6 are

9  admitted.

10      (Exhibits 4, 5, 6 admitted.)

11      MR. MINSER:  If we could pull up Exhibit 4 first.

12  BY MR. MINSER:

13  Q. Agent Anderson, we're looking at Exhibit 4 now.

14  A. Okay.

15  Q. In the background, there is some police lights.  Can you

16  describe which one is your police vehicle and which one is

17  Agent Albrets' vehicle?

18  A. Mine is the one on the far right side with the red and blue

19  flashing lights on; and, then, Agent Albrets' is the one

20  directly to the left of my vehicle.

21  Q. Now, this photo, it shows -- it's pretty light by the car.

22  A. Correct.

23  Q. Is that how you observed the vehicle?

24  A. No.  Our CSI uses a flash on his camera, so that is what is

25  causing the extra light that we're seeing in the photo.

Taber Anderson - Direct

1    *Q.* So when you initially initiated the stop, were you really

2    able to see inside the vehicle?

3    *A.* No, I wasn't.

4         *MR. MINSER:* If we could move on to Exhibit 5, please.

5    *BY MR. MINSER:*

6    *Q.* Looking at Exhibit 5, that's the license plate you entered

7    in to figure out the ATL?

8    *A.* Correct.

9    *Q.* And, again, is this somewhat of the angle you had looking

10   into the vehicle?

11   *A.* As I was I driving by it, yes.

12        *MR. MINSER:* If we could move -- actually, we'll leave

13   this up.

14   *BY MR. MINSER:*

15   *Q.* Now we're at the point, then, where you have made sure

16   there is no one else in the car, and you're reapproaching the

17   driver.  Correct?

18   *A.* Correct.

19   *Q.* What happens at this point?

20   *A.* As I was reproaching him, I was planning on doing a

21   pat-down for weapons.  Before I did that, I asked Mr. Grant --

22   who I later found out was Mr. Grant -- "Do you have any weapons

23   on you?"

24   *Q.* What was the response?

25   *A.* He said, "Right there," and he looked down towards his

Taber Anderson - Direct

1   waistline, his legs area.  He was not very clear about where a

2   weapon may be located on him.

3   Q.  What did you take that response to mean?

4   A.  That he was armed.

5   Q.  Now, at this point do you still have any physical

6   descriptors or anything indicating who the subject of the ATL

7   was?

8   A.  I did not.

9   Q.  Based upon that and this indication from the driver of the

10  vehicle, did you have any belief as to who the subject of the

11  ATL was?

12  A.  I believed it was going to be Mr. Grant, because based on

13  the ATL, I was looking for somebody who was possibly armed with

14  a deadly weapon.  And he just indicated to me, I've got a

15  weapon on me.

16  Q.  So as a result of this and him saying he has a weapon, what

17  did you do?

18  A.  Like I said, he was not very clear about where this weapon

19  was.  I asked him multiple other times where it was, and he

20  didn't tell me exactly where it was, so I started to do the

21  pat-down to locate it on my own.

22  Q.  What happened when you conducted the pat-down?

23  A.  So I checked the front waistband and the front pockets

24  first.  Those are most high-risk areas.  In his front left

25  pocket, I felt what I believed to be a high-capacity -- I

Taber Anderson - Direct

1    immediately recognized as a high-capacity magazine.  Excuse me.

2    *Q.*  What do you mean by "high-capacity magazine"?

3    *A.*  In Colorado, anything over a 15-round magazine is

4    considered illegal.  Can't possess it unless there are certain

5    circumstances that are met.

6    *Q.*  So based upon feeling that, what did you do?

7    *A.*  I removed the magazine from his pocket.

8    *Q.*  What was it?

9    *A.*  It was a high-capacity magazine.

10   *Q.*  What else did you find?

11   *A.*  In that pocket while I was pulling the magazine out was

12   also a lot of cash, and then there was a scale with white

13   residue on it.

14   *Q.*  Did you continue a pat-down search?

15   *A.*  I did.

16   *Q.*  What was discovered after checking that pocket?

17   *A.*  I discovered a standard-capacity 15-round handgun magazine

18   in his front right pocket.

19   *Q.*  Did you continue the pat-down search?

20   *A.*  I did.

21   *Q.*  What did you find next.

22   *A.*  I continued the pat-down.  I went down his right leg.  And

23   on the inside of his right leg, about his knee, I felt what I

24   recognized as a handgun.

25   *Q.*  What did you do?

Taber Anderson – Direct

1    *A.*  I could tell the handgun wasn't in a holster.  It took me a

2    little bit to fish this handgun out because, one, I didn't want

3    to discharge the firearm and potentially hurt him or myself;

4    and, two, it was between two sets of jeans that he had on.  So

5    I had to roll up one set of jeans and put my hand in there and

6    figure out a way to fish the gun out of his pants.

7    *Q.*  Did you eventually remove the firearm?

8    *A.*  I did.

9    *Q.*  Did you notice anything else while you were conducting the

10   pat-down search?  Any bulges?

11   *A.*  Yes.  There was a bulge, I believe it was in his left sock,

12   that I saw while I was doing the pat-down.

13   *Q.*  What did you do with that?

14   *A.*  Based on my training and experience in narcotics

15   enforcement, that's a pretty common area for people to store

16   narcotics, trying to hide them from the police.  So I removed

17   that bulge from that sock, and I found it was another sock that

18   was rolled up.

19   *Q.*  Did you look inside of it?

20   *A.*  Not at that time.

21   *Q.*  What did you do?

22   *A.*  I set it to the side on the ground and then took Mr. Grant

23   back to my vehicle.

24   *Q.*  When you brought Mr. Grant back to your vehicle, what

25   happened?

28

Taber Anderson – Direct

1   A.   I did a secondary pat-down just to ensure there were no

2   other firearms, no other weapons on him that could hurt me.

3   And I asked over the radio for a supervisor to come -- all of

4   our patrol sergeants have metal detector wands in the

5   vehicles -- so I could do a metal detector wand search on

6   Mr. Grant to confirm 100 percent there were no other weapons on

7   him.

8         MR. MINSER:   If we could pull up Exhibit 6 please.

9   BY MR. MINSER:

10  Q.   Now showing you Exhibit 6, can you describe what is going

11  on in this photographs?

12  A.   Yeah.  So this would be -- where those items are located

13  are roughly where Mr. Grant was laying on the ground.  This was

14  just where I set everything once I got it from his pockets and

15  found the handgun in between his pants.  So that's where I sat

16  everything.  It was not touched after that.

17  Q.   Where was the passenger of the vehicle in relation to these

18  items?

19  A.   From how we're looking at the picture, he would have been

20  laying to the right side.  He was not laying on the ground

21  while I was doing the pat-down and the search of Mr. Grant.

22  Q.   Where was the passenger?

23  A.   He was at Agent Albrets' vehicle, being patted down

24  himself.

25  Q.   So eventually you get the defendant back to your vehicle.

Taber Anderson - Direct

1    At this point have you confirmed his identity?

2    A.  Not at that point.

3    Q.  When do you confirm his identity?

4    A.  After I made that -- I'm sorry.  After I requested that

5    metal detector wand over the radio, did my second pat-down, I

6    sat him in the car and then asked him to identify himself

7    verbally.

8    Q.  When he identified himself verbally, what were you able to

9    do to confirm identity?

10   A.  I was able to go back to my computer and enter his name and

11   pull up a photographs of him.

12   Q.  Why didn't you do that initially with the subject of the

13   ATL?

14   A.  Are you talking initially when I got on scene and found the

15   ATL?

16   Q.  Yes.

17   A.  The officer safety caution is obviously a huge concern for

18   me.  Knowing it was a felony menacing was a major concern,

19   because I know there is a deadly weapon.  The passenger got out

20   of the car, and then as soon as I drove by was getting back

21   into the car.  That led me to believe they were getting ready

22   to leave the area.  I did not have time to enter any of that

23   information to pull up a photograph of the subject of the ATL,

24   just based on the officer safety risks that were present there

25   at that time.

Taber Anderson - Direct

1    *Q.*  Is that also why during the course of your stop when you

2    were the only one on scene you didn't get that information?

3    *A.*  Correct.

4    *Q.*  So timing-wise, from when you initiated the stop to when

5    you felt that extended magazine on the defendant, how long was

6    it?

7    *A.*  Like I said, it was probably a minute and a half, two

8    minutes for Agent Albrets to get there and maybe another thirty

9    seconds for us to get them detained, check the car, and for me

10   to locate the magazine.  So anywhere from two to two and a half

11   minutes.

12   *Q.*  How long did it take you to -- let me rephrase that.

13   *A.*  Yep.

14   *Q.*  You indicated before that it was approximately three to

15   four minutes; right?

16   *A.*  I'm sorry?

17   *Q.*  You indicated previously it was approximately three to four

18   minutes?

19   *A.*  Yeah.  Somewhere in that area.  I can't give an exact

20   estimate.

21   *Q.*  Fair to say you weren't looking at your watch?

22   *A.*  Correct.

23   *Q.*  How long did it take before you confirmed the identity of

24   Mr. Grant from the time you initiated the stop to the time you

25   were actually able to see the DMV photo?

Taber Anderson - Direct

1    *A.* To where I saw the DMV photo, I would have to look at the

2    dispatch notes to be 100 percent -- I guess, more accurate.

3    We're talking probably five, six minutes, somewhere around

4    there.

5    *Q.* Fair to say, less than ten minutes?

6    *A.* Yeah, easily.

7    *Q.* At any point prior to confirming who you eventually thought

8    to be Mr. Grant, did you receive any physical descriptors of

9    the subject of the ATL?

10   *A.* I did not.

11   *Q.* Other than the passenger indicating that he was Chris, was

12   there any other indication that that -- that he was, in fact,

13   Chris?

14   *A.* No, there was not.

15   *Q.* And as law enforcement -- let me rephrase that.

16        Was Mr. Vazquez-Euresti's identity eventually

17   confirmed?

18   *A.* It was eventually, yes.

19   *Q.* Approximately how long did that take?

20   *A.* I can't say exactly how long it took to be confirmed,

21   because Agent Albrets was the one who confirmed his identity.

22   Agent Albrets notified me that the subject he had in custody

23   was actually Mr. Vazquez-Euresti after I identified Mr. Grant

24   -- positively identified Mr. Grant.

25   *Q.* That was after you had found the extended magazine and the

Taber Anderson - Direct

1    firearm?

2    *A.*  Correct.

3              *MR. MINSER:*  If I could have one moment, please, Your

4    Honor.

5              *THE COURT:*  Yes.

6    *BY MR. MINSER:*

7    *Q.*  Agent Anderson, I'm going to direct you now to Exhibit 3.

8    *A.*  Okay.  I got it.

9    *Q.*  What is Exhibit 3, the first page?

10   *A.*  The first page is all of the information -- it's the actual

11   attempt to locate entry.  That first page is all of the

12   information that I had at the time on scene.

13   *Q.*  Is that what you saw, then, when you initiated the stop?

14   *A.*  Yes, it was.

15   *Q.*  Now, on Exhibit 3, there are almost eleven other pages with

16   that.

17   *A.*  Okay.

18   *Q.*  Correct?

19   *A.*  Correct.

20   *Q.*  Did you see any of those other pages?  And by "see," I

21   mean, at the time of the initiation of the stop, did you

22   have --

23   *A.*  Nope, I did not.

24   *Q.*  Why?

25   *A.*  There -- officer safety cautions, anything entered into

1    NCIC or CCIC that has officer safety caution typically pops up

2    before any other entry when I start clicking through the query

3    results.

4    *Q.*  So, again, you didn't see those other pages?

5    *A.*  No, I didn't.

6    *Q.*  Is it fair to say, you just didn't have time to look up the

7    other information?

8    *A.*  Correct.

9    *Q.*  Because there was also a sex offender registration entry;

10   correct?

11   *A.*  Correct.

12   *Q.*  And can you explain how that came into play?

13   *A.*  Sure.  The sex offender registration entry -- on all sex

14   offender entries, they are linked to a license plate, if the

15   registered sex offender has a vehicle registered to them.

16   After looking at it later, I found there weren't any other --

17   there were some descriptors, but there was not a race

18   descriptor for Mr. Vazquez-Euresti and only ethnicity as

19   Hispanic.

20   *Q.*  I guess my question to you, did you see that at the time

21   you initiated this stop?

22   *A.*  No, I didn't.

23   *Q.*  Why not?

24   *A.*  Like I said, the officer safety entries typically pop up

25   first.  If a sex offender entry does pop up before an officer

Taber Anderson - Direct

1    safety entry does, I'll continue to see a blinking red light on

2    my screen.  A sex offender registration entry isn't an officer

3    safety concern to me; it's just a notification.  So if I

4    continue to see a blinking red light, that is a caution to me

5    that there is something else going on here that is more

6    important than seeing the sex offender registration.

7    *Q.*  Which is the ATL?

8    *A.*  Correct.

9    *Q.*  It's fair to say this situation developed pretty quickly?

10   *A.*  Correct.

11   *Q.*  And did that affect your ability to look up all of this

12   other information?

13   *A.*  Absolutely.

14   *Q.*  How?

15   *A.*  I just didn't have time to do it, with the officer safety

16   concerns.

17          *MR. MINSER:*  If I could have one moment, Your Honor.

18          *THE COURT:*  Yes.

19   *BY MR. MINSER:*

20   *Q.*  Agent Anderson one last question.

21   *A.*  Okay.

22   *Q.*  The passenger and driver, from your vantage point, did they

23   look pretty similar in age?

24   *A.*  Yeah, similar in age.

25          *MR. MINSER:*  Nothing further, Your Honor.  Thank you.

1          *THE COURT:*  All right.  Ms. Stimson,

2    cross-examination.

3          *MS. STIMSON:*  Thank you, Your Honor.

4                      **CROSS-EXAMINATION**

5    *BY MS. STIMSON:*

6    *Q.*  Good morning, Agent Anderson.

7    *A.*  Good morning.

8    *Q.*  Could you please look in that exhibit book to No. 8.

9    *A.*  Sure.

10   *Q.*  Photograph -- I'm sorry.  9.

11   *A.*  9?

12   *Q.*  Yeah.

13   *A.*  Okay.  I have Exhibit 9.

14   *Q.*  And do you recognize that Government Exhibit 9 as a

15   photograph of Mr. Vazquez-Euresti?

16   *A.*  I do.

17          *MS. STIMSON:*  I would move, Your Honor, to admit

18   Government Exhibit 9.

19          *THE COURT:*  Any objection?

20          *MR. MINSER:*  No, Your Honor.

21          *THE COURT:*  All right.  Exhibit 9 is admitted.

22          (Exhibit 9 admitted.)

23   *BY MS. STIMSON:*

24   *Q.*  Switching gears, Agent Anderson.  You described this area

25   where the motel is several times as a high crime area; correct?

Taber Anderson - Cross

1   *A.*   Correct.

2   *Q.*   And as an officer, you know that you can't just go up to

3   people and order them on the ground and point a gun at them

4   just because they're in a high crime area; correct?

5   *A.*   Correct.

6   *Q.*   You have to have a basis, a reasonable suspicion, or

7   probable cause?

8   *A.*   Right.

9   *Q.*   And in this case, your attention was drawn to the Ford

10  Fusion because you didn't recognize it; right?

11  *A.*   Correct.

12  *Q.*   And so if I could pull up or just refer you to Government

13  Exhibit 2, the map --

14  *A.*   Uh-huh.

15  *Q.*   I want to understand where you were driving and where you

16  saw the Ford Fusion on Government Exhibit 2.

17  *A.*   Sure.  Am I able to draw on this at this point or --

18  *Q.*   I don't think so, but it's okay.  I'm going to direct you

19  to where it says "Depew Street."

20  *A.*   Okay.

21  *Q.*   And then it looks to me like the entrance into that parking

22  lot is a narrow one between a group of trees and another

23  building that says Doja High Tech Solutions.  Is that how you

24  enter into the parking lot?

25  *A.*   Yes.

Taber Anderson – Cross

1   *Q.*  And because of that big grouping of trees, it looks to me

2   like the way you see into that parking lot is also through that

3   narrow driveway; is that correct?

4   *A.*  Yeah.  The map makes it look more narrow than it is just

5   because the trees are grown.

6   *Q.*  Sure.

7   *A.*  It's not an un-- I'm sorry.  It is not an obstructed view

8   into the parking lot.

9   *Q.*  Okay.  Where was the Ford Fusion in relation to these other

10  cars that are parked?

11  *A.*  Sure.  So approximately -- in looking at the map, you look

12  at the trees just north of that entrance you described to me --

13  *Q.*  Yes.

14  *A.*  If you continue to look north, there is kind of a

15  pink-colored patio.  That is going to be directly west of that

16  parking space.  So it would be just -- does that make sense?

17  *Q.*  I also see in the drawing of the parking lot, it goes from

18  top to bottom, white, dark, gray or blue car.

19  *A.*  Uh-huh.

20  *Q.*  And then are we going down about one, two -- then there is

21  two joined spots with the design.

22  *A.*  Yes.

23  *Q.*  Is it, then, right below that?

24  *A.*  Somewhere in that area, yes.

25  *Q.*  Okay.  Into the parking lot.  Certainly not by that

Taber Anderson – Cross

1    entryway?

2    *A.*   Correct.

3    *Q.*   So you were driving off of Colfax on Depew?

4    *A.*   Like I said, I don't remember which way I was going on

5    Depew; but I entered from that entrance that you described.

6    *Q.*   Okay.  And then you actually drove into that parking lot.

7    So you are in with the parking spaces, not on Depew?

8    *A.*   Correct.

9    *Q.*   Okay.  And were you --

10          THE COURT:  Hold on a second, counsel.  You all may

11   know what you're talking about, but the Court does not.  Since

12   I'm the finder of fact, I need to know.

13          So where in the parking lot was the white Ford Fusion

14   when you saw it?  Why don't you take that, which is marked as

15   Exhibit 2 -- you have that document in front of you.

16          THE WITNESS:  Yes.

17          THE COURT:  Take a pen -- is there a pen there?

18          THE WITNESS:  I have a pen on me, Your Honor.

19          THE COURT:  All right.  Can you draw a circle around

20   the parking spot where you saw the white Ford Fusion?

21          THE WITNESS:  Sure.  I'm going to circle a couple of

22   spots, because I don't remember exactly where it was.  But

23   approximate area I just circled on there.

24          THE COURT:  All right.  Will you hand that document to

25   Ms. Myhaver.

1          Ms. Myhaver, will you show that to Mr. Minser and to

2    Ms. Stimson.

3          *MS. STIMSON:*  Thank you.

4          *THE COURT:*  The record will reflect, we are now going

5    to mark as Exhibit 2A the document that the officer just marked

6    with the location of where the vehicle was when he saw it.

7          That document has now been handed to the Court.

8          *MS. STIMSON:*  Thank you, Your Honor.

9          *THE COURT:*  All right.  Thank you.

10         You may proceed.

11   *BY MS. STIMSON:*

12   *Q.*  I also want to be clear about where you were,

13   Agent Anderson in relation to the circle you just drew.

14   *A.*  Okay.

15   *Q.*  Can you describe where you were?

16   *A.*  At what point in time?

17   *Q.*  When you first saw the Ford Fusion and the license plate.

18   *A.*  It would be right when I was -- well, I first saw the Ford

19   Fusion when I was entering the parking lot.  I would see the

20   license plate as I got a little bit closer to it when I'm

21   driving by.

22         *MS. STIMSON:*  May the Exhibit 2A go back, please, to

23   Agent Anderson.

24         I'm -- would the Court like me to --

25         *THE WITNESS:*  Thank you.

Taber Anderson – Cross

1   *BY MS. STIMSON:*

2   *Q.*  And so, Agent, you drove in.  And then behind where the

3   Ford Fusion was --

4   *A.*  Correct.

5   *Q.*  And then did you turn around and drive back, so you were

6   between the Ford Fusion and the exit?

7   *A.*  Yes.  So I turned around and drove back.  On this motel,

8   there is a tunnel that you go through to the north.  So there

9   are two entrances and two exits, technically.  So I drove to

10  the north -- towards where that northern exit is and then did a

11  U-turn to turn around at that point.

12  *Q.*  Where is the tunnel?

13  *A.*  Would you like me to mark it on the exhibit?

14       *MS. STIMSON:*  I think if it's okay with the Court,

15  Exhibit 2 is -- well, it was on the screen.

16       Can Exhibit 2 go back on the screen?

17  *BY MS. STIMSON:*

18  *Q.*  Can you point so we can see where the tunnel is?

19  *A.*  Sure.  Would you like me to do it on this piece of paper?

20       Would have been right below my index finger here.

21  *Q.*  Okay.  You can see the indentation on the top of that

22  building --

23  *A.*  Yes.

24  *Q.*  -- you're saying that's a tunnel out?

25  *A.*  Yeah.  That's a tunnel that will lead out to West Colfax

1    Avenue.

2    *Q.*  All right.  Where then, Agent Anderson did you stop and

3    enter the license plate into your computer?

4    *A.*  I never stopped to enter the license plate.  I entered it

5    as I continued to drive north to that northern exit.  So as I

6    was just southeast, as -- of the vehicle, continuing to drive

7    north, I'm running this license plate and continuing to drive

8    slowly.

9    *Q.*  As you're driving slowly, you can enter a license plate

10   into your computer screen?

11   *A.*  Correct.

12   *Q.*  You then pulled up information on the license plate, which

13   was this attempt to locate?

14   *A.*  Correct.

15   *Q.*  And can you now please refer to Government Exhibit 3.

16   *A.*  Yes.  Exhibit 3?  You're talking the photo?

17   *Q.*  Yes.

18   *A.*  Okay.  I've got it up.

19   *Q.*  Okay.  And you testified that this is what came up on your

20   screen?

21   *A.*  I'm sorry.  I've got Exhibit 3, which is the overhead map.

22   *Q.*  Government Exhibit 3 is the attempt to locate.

23   *A.*  I'm sorry.  Okay.  I'm sorry.  I got it backwards.  I've

24   got the attempt to locate in front of me.

25   *Q.*  No problem.  So I would like to look at that for a moment.

Taber Anderson – Cross

1    *A.*  Okay.

2    *Q.*  Included in that attempt to locate was the good DV slash

3    felon menacing charges; correct?

4    *A.*  Correct.

5    *Q.*  DV is domestic violence?

6    *A.*  Correct.

7    *Q.*  So when you read that, does it come into your mind that

8    this was a domestic dispute -- or in Colorado law, a dispute

9    between a person and their intimate partner --

10   *A.*  Correct.

11   *Q.*  -- involving a weapon?

12   *A.*  Correct.

13   *Q.*  In your experience, a domestic violence incident typically

14   doesn't have two defendants -- two men like, for example an

15   aggravated robbery would have; correct?

16   *A.*  That's not necessarily true.  Depending on the couple's

17   sexual orientation.  It may be two males; it may be a male and

18   a female.

19   *Q.*  Okay.  I'm sorry for saying "male."  But in a domestic

20   violence warrant, that doesn't indicate to you that there were

21   two defendants running around with weapons; it indicates to you

22   that there is one?

23   *A.*  Correct.  Usually one suspect.

24   *Q.*  Suspect.

25   *A.*  Correct.

Taber Anderson – Cross

1   *Q.* Unlike if what would have popped up, aggravated robbery,

2   you may have thought, oh, couple of guys, couple of women,

3   whatever, a group of people who did a robbery together.  More

4   common that you see multiple people than in a domestic?

5   *A.* Sure.  Depending on the information that I'm given;

6   correct.  Yeah.

7   *Q.* You also knew when you got that initial attempt to locate

8   that that incident was approximately three days ago, prior to

9   that day; is that right?

10  *A.* At the time that I acted, no.  Later on, yes, I did find

11  that out.  I didn't have time to look at the date that the

12  actual incident occurred, just based on the officer safety

13  cautions and believing that they were going to leave in that

14  vehicle.

15      The date is on the attempt to locate hit, but that was

16  not something that caught my attention, because there were

17  officer safety concerns.  If I pull it up on NCIC and CCIC, it

18  is still considered valid until the agency takes it off when

19  that subject is taken into custody.  So the date was not

20  relevant at that time, just because of the officer safety

21  concerns.

22  *Q.* The officer safety concern was that there was a person with

23  a weapon; is that the issue?

24  *A.* Right.

25  *Q.* And, I mean, of course, your officer safety is always

Taber Anderson - Cross

1    paramount to yourself.  You don't want to put yourself in a

2    situation that you don't need to; correct?

3    A.   Correct.

4    Q.   And reading the attempt to locate --

5    A.   Uh-huh.

6    Q.   -- you can find out additional information about what

7    you're going into; correct?

8    A.   Typically, yes.

9    Q.   And in this case, reading it would have caused you to know

10   that this was from three days before; correct?

11   A.   Reading the entire entry, yeah.

12   Q.   And that's a different situation than if it was something

13   that happened an hour before; correct?

14   A.   No, not necessarily.

15   Q.   If something happened an hour before, there is kind of a

16   hot pursuit issue.  You know that -- you know that this person

17   may still have that weapon.  When three days have passed,

18   common sense tells you maybe they still don't; correct?

19   A.   No, that's not true at all.  If somebody is going to arm

20   themselves with a weapon, I can't say when they're going to get

21   rid of that weapon, whether it's going to be an hour or three

22   days or three months from now.  Typically, if somebody is known

23   to carry a weapon, we'll be notified of that.  And it's pretty

24   common practice that they will continue to carry a weapon,

25   based on my training and experience.

Taber Anderson - Cross

1  *Q.*  Based on your training and experience, if it's aired that a

2  robbery just occurred, and the suspects are in a Ford Fusion,

3  there is a higher chance that they have the weapon than if the

4  robbery occurred three days ago; correct?

5  *A.*  I would not say a higher chance.  If a robbery occurred and

6  I was notified a specific vehicle was involved in it, my

7  training and experience would tell me that they're likely still

8  going to be armed when I contact the vehicle to conduct the

9  investigation.

10           For instance --

11 *Q.*  Let's move to the second page of Exhibit 3.  Let's flip it

12 over.

13 *A.*  Okay.

14 *Q.*  This part was -- also came up on your screen, but you

15 needed to scroll down to see it.  Is that correct?

16 *A.*  Yeah, the registered sex offender hit would pop up at some

17 point in time.  I don't recall at what point in time it did on

18 that night.

19 *Q.*  Well, when you enter in the license plate, the information

20 attached to the license plate comes up on your screen; correct?

21 *A.*  Correct.

22 *Q.*  It doesn't come up on your screen maybe five hours later.

23 It comes up on your screen when you enter the license plate.

24 *A.*  Not always.  If we're having computer issues, it may pop up

25 five hours later.  It just depends on the day and whether

Taber Anderson - Cross

1   Colorado Bureau of Investigations or Department of Motor

2   Vehicles are having computer issues.

3   *Q.* Were you having computer issues that night, sir?

4   *A.* No.

5   *Q.* And so you see attached to that license plate an attempt to

6   locate, that Christopher Vazquez-Euresti, the one who may have

7   the weapon, who has the warrant, is Hispanic; correct?

8   *A.* Are you talking about at the time that I made the stop?

9   *Q.* If you would have read your computer screen, you could have

10  gotten that information; correct?

11  *A.* I could have gotten that information.  The reason I didn't

12  have that information at the time of the stop, like I explained

13  earlier, is if I pull up a registered sex offender hit, and my

14  screen continues to blink red, that means there is a higher

15  priority officer safety concern that I need to read.  And the

16  sex offender registration is not a priority at that point.

17  *Q.* But arresting the person who has the warrant is your

18  priority; correct?

19  *A.* Well, the priority would be making the scene safe and then

20  investigating to determine who that is.  But, yes.

21  *Q.* Without reading your computer screen and seeing the name

22  Christopher Vazquez-Euresti, there is an indication to you that

23  that person may be Hispanic; correct?

24  *A.* True.  Based on the last name, probably Hispanic descent.

25  *Q.* So you're driving -- let me take you back to the parking

Taber Anderson - Cross

1   lot -- and you type in the license plate, see the name of a

2   person who may be Hispanic --

3   A.   Okay.

4   Q.   -- you then see a passenger get in -- I'm sorry -- get out

5   and get back into the car; is that correct?

6   A.   Correct.

7   Q.   So when you initially saw the Ford Fusion, there was one

8   person in the car?

9   A.   No.   Like I said, there were two people when I initially

10  saw it.   As I was driving by, the passenger got out.   As I got

11  past the car and was turning around, the passenger got back in.

12  Q.   And that passenger is the person that you see in Government

13  Exhibit 9?

14  A.   Correct.   Later identified to be that passenger.   As I

15  said, it wasn't well lit before, so I wasn't able to get a

16  really good visual of who that person was getting into the

17  passenger seat.

18  Q.   You were able to read the license plate on the Ford Fusion;

19  correct?

20  A.   Correct.

21  Q.   And you could see the person who was at the front of the

22  car moving around; correct?

23  A.   No.   Because once they were out of the car, I was driving

24  by it.   So they would have been behind me, to where I had to

25  look in my mirror to see who was moving in front of the

Taber Anderson – Cross

1   vehicle.  Does that make sense?

2   *Q.*  You saw a person get out of the vehicle?

3   *A.*  Correct.

4   *Q.*  And then you saw a person get back into the vehicle?

5   *A.*  Correct.

6   *Q.*  And it was light enough for you to read the license plate

7   on the vehicle?

8   *A.*  Correct.  If I recall correctly, the vehicle was running,

9   so there would have been license plate lights on the vehicle

10  for me to read that.

11  *Q.*  So you saw that the person who got out and got back in was

12  a Hispanic male?

13  *A.*  Not at that time, until I initiated the actual stop.  Like

14  I said, it wasn't well lit; so I wasn't able to get the actual

15  description of the person getting back into the car until I

16  turned all the way around and initiated the stop.

17  *Q.*  Okay.  So let's talk about that stop.

18  *A.*  Yeah.

19  *Q.*  Where did you park your patrol car in relation to the Ford

20  Fusion?

21  *A.*  Sure.  One of the exhibits we went over had a picture of

22  the Ford Fusion and then my vehicle in the background.  My car

23  had not moved from that point once I initiated the stop.

24  *Q.*  Thank you.

25  *A.*  Yeah.

Taber Anderson – Cross

1   *Q.* Is that the one you were referring to, Government

2   Exhibit 4?

3   *A.* Give me just a second to find that.

4   *Q.* It's on the screen too.

5   *A.* I'm sorry.  Yes, it would be Exhibit 4.

6   *Q.* Those are your lights on the passenger side?

7   *A.* Correct.  My vehicle would be the one that's on the far

8   right in this photograph.

9   *Q.* Okay.  So you then get out and walk up to the passenger

10  side or the driver's side of the Ford Fusion?

11  *A.* I didn't walk up to that car.  I stayed by my vehicle and

12  then gave the occupants to get out at gunpoint.

13  *Q.* So you stayed by your vehicle and pulled your gun out?

14  *A.* Correct.

15  *Q.* You pointed it at the Ford Fusion?

16  *A.* Correct.

17  *Q.* And you ordered the people who were in the Ford Fusion to

18  get out of the Ford Fusion?

19  *A.* Correct.

20  *Q.* And to have the driver walk around the car and lay down on

21  your side, the passenger side?

22  *A.* Correct -- no.  I would have ordered them -- the driver to

23  walk out of the vehicle, and then they would have laid down on

24  the passenger side of that Ford Fusion, but not the passenger

25  side of my vehicle.  So they would be in between the front

Taber Anderson - Cross

1    bumper of my car and the passenger side of that Ford Fusion.

2    Q.  Okay.  And so at that point you're by yourself with your

3    gun drawn, pointed at Mr. Euresti and Mr. Grant?

4    A.  Correct.

5    Q.  And both men were compliant with your orders?

6    A.  Correct.

7    Q.  And then they both laid down on the concrete pavement,

8    according to what you just ordered them to do?

9    A.  Correct.

10   Q.  And you continued to point your gun at them?

11   A.  Yes.

12   Q.  And at that point you could see that one man is black;

13   correct.  Mr. Grant?

14   A.  Correct.

15   Q.  And the other man is Hispanic, Mr. Vazquez-Euresti;

16   correct?

17   A.  Correct -- well, I'm sorry.  Let me clarify.  When I see

18   stuff in NCIC and CCIC, Hispanic is just an ethnicity.  It

19   doesn't necessarily tell me skin color.  You can still be black

20   and be of Hispanic descent.

21   Q.  Sure.

22   A.  Does that make sense?

23   Q.  Sure.

24   A.  Okay.  I just wanted to clarify that.

25   Q.  But you have one man who in your opinion in black --

Taber Anderson - Cross

1    *A.*   Uh-huh.

2    *Q.*   -- and one man who is in your opinion Hispanic laying on

3    the ground; correct?

4    *A.*   Correct.

5    *Q.*   And your attempt to locate is for a man who is named

6    Christopher Vazquez-Euresti; correct?

7    *A.*   Correct.

8    *Q.*   Which you thought there was an indication he could be

9    Hispanic; correct?

10   *A.*   Correct.

11   *Q.*   And then -- in fact, on his sex offender attachment to his

12   license plate, it says he's Hispanic, too; correct?

13   *A.*   Correct.  But there is no race associated to that.

14   *Q.*   So when you read "ethnicity, Hispanic," you're

15   distinguishing that from race, Hispanic?

16   *A.*   Correct.  Based on the entries that I see from NCIC and

17   CCIC.  Like I said before, you can be white Hispanic, which I

18   think is what you're referring to as typically Hispanic, like

19   brown-skinned; you can be black Hispanic; you can be Asian of

20   Hispanic descent.  It's just based on your lineage.

21   *Q.*   At this moment in time when you're standing in the parking

22   lot with your gun pointed at these two men, the mission here is

23   to arrest the one who has the warrant; correct?

24   *A.*   Eventually, yes.

25   *Q.*   The scene is safe, you would agree?

Taber Anderson – Cross

1   *A.*   No.  Not at all.

2   *Q.*   There is two men who have followed your commands to get out

3   of that car; correct?

4   *A.*   Right.

5   *Q.*   And they're laying on the concrete ground following your

6   commands; correct?

7   *A.*   Correct.

8   *Q.*   And you're continuing to point your gun at them; correct?

9   *A.*   Correct.

10  *Q.*   At this point, you then say, Who's Chris; correct?

11  *A.*   After I asked for information from dispatch for further

12  descriptors, then, yes, I asked, "Who is Chris?"

13  *Q.*   Okay.  So you had already seen on your screen the attempt

14  to locate, who was Christopher Vazquez-Euresti?

15  *A.*   Correct.

16  *Q.*   And you then had them down on the ground at gunpoint, and

17  you called dispatch on your radio?

18  *A.*   Correct.

19  *Q.*   And you asked dispatch for descriptors?

20  *A.*   Yes.  I asked if there were any additional descriptors,

21  because there were none listed in the ATL.

22  *Q.*   The part that you read.  If you would have scrolled down

23  and seen the sex offender part, you would have seen the

24  descriptors?

25  *A.*   No.  That's a completely different page.  So I click on --

Taber Anderson - Cross

1   there is a button that says "query results."  I click on it

2   once, it's going to pull up the sex offender registration

3   information.  I can look at all of the sex offender

4   registration information.  I can I click on it again, and it's

5   going to go to the attempt to locate, or vice versa.  I don't

6   recall which order it was in this time.  And then I can click

7   on it again, and it will give me DMV information.  So it's not

8   just one continuous page.  I could continue to scroll.  I would

9   have to go back, and I'd have to mess with my computer and

10  either push arrows or push page up, page down button and take

11  time to mess with my computer to look at all of that

12  information on the sex offender registration hit.

13  Q.  Okay.  I didn't understand the pushing of the buttons part.

14  A.  My apologies.

15  Q.  I thought it was scrolling.

16  A.  No.

17  Q.  It comes up the attempt to locate, you can push a button on

18  your screen, and then the sex offender information comes up

19  next?

20  A.  Correct.

21  Q.  So in the time when Mr. Vazquez-Euresti is getting out of

22  the car and getting back into the car, you could have pushed

23  the button to see the additional descriptors?

24  A.  Right.  Like I said, I don't recall whether the sex

25  offender hit came up first or the attempt to locate hit did.

Taber Anderson – Cross

1   If the sex offender registration hit did come up first, that

2   typically is not a concern to me.  It's pretty normal to see

3   those, especially on West Colfax Avenue.  But when I see that

4   button continuing to blink red, that tells me there is an

5   officer safety concern.  That is a higher priority than looking

6   at the sex offender registration hit.  So that's why I didn't

7   look at any information on the sex offender registration hit,

8   if it did pop up first.

9          Does that make sense?

10  Q.  It does.  But if you're concerned about officer safety and

11  you have information available to you to determine very quickly

12  more information to protect your safety, you have the ability

13  to find out that information; correct?

14  A.  Correct.  But it would take some time.

15  Q.  To press the button and read it?

16  A.  Yeah.  And like I said, depending on whether the sex

17  offender hit came up first or not, I may have to mess with some

18  buttons on my computer to go back and forth and figure out

19  where this information is while this person is getting out of

20  the car and I believe that they're about to leave the parking

21  lot.

22  Q.  In any event, ow we're back to where you're pointing the

23  gun at them, and they're laying on the ground complying.  You

24  then call dispatch, and you don't get additional descriptors;

25  correct?

Taber Anderson - Cross

1    *A.*   Correct.

2    *Q.*   But you at that point say, "Who is Chris?"

3    *A.*   Correct.

4    *Q.*   And the one who is Hispanic says, "I'm Chris"?

5    *A.*   Correct.

6    *Q.*   So at that point you have an indication that between a

7    Hispanic man and a black man, the one who is Hispanic has the

8    Hispanic last name, you now have that person say, "I am Chris,"

9    the one you're looking for; correct?

10   *A.*   I just said, "I'm Chris."  He didn't say, I'm the one

11   you're looking for.  He said, "I'm Chris."

12   *Q.*   Sure.

13   *A.*   I didn't have any way to verify that at that point.

14   *Q.*   Sure.  But in your mind, you knew Chris is the one you were

15   looking for?

16   *A.*   I knew Chris was the subject of the ATL; correct.

17   *Q.*   At that point the other officer arrives; correct?

18   *A.*   Correct.

19   *Q.*   And you then split up.  And the other officer stays with

20   Mr. Vazquez-Euresti, and you go with Mr. Grant.  Correct?

21   *A.*   Correct.

22   *Q.*   And at this point, you don't verify Mr. Grant's identity

23   additionally?

24   *A.*   Not at that point.

25   *Q.*   You handcuff him?

Taber Anderson - Cross

1    A.  Correct.

2    Q.  And after he's handcuffed, you don't verify his identity;

3    correct?

4    A.  Correct.  There were still other officer safety concerns

5    that we were trying to eliminate on scene there, like clearing

6    the vehicle.

7    Q.  And at -- well, you have handcuffed Mr. Grant.  Obviously,

8    his hands are cuffed; so he's not able you to reach for weapons

9    or do anything because he's handcuffed.  Correct?

10   A.  That's not true at all.  Handcuffs are restraints, but that

11   doesn't mean somebody is completely restricted from moving

12   around.  I've had plenty of people who have slipped their cuffs

13   to the front of them, got their handcuffs completely off of

14   them, reached for something in their back pocket, collected

15   their phone.  At no point do I believe that he is unable to

16   reach for anything.

17   Q.  Where is your gun at this point?

18   A.  It's still out.

19   Q.  And Chris, Mr. Vazquez-Euresti, is also handcuffed at this

20   point?

21   A.  Correct.

22   Q.  Do you -- and you had the ability to verify his identity at

23   that point?

24   A.  No, not at that point, until we got them back in the car

25   and I can pull up the photograph.  Not while we're still --

Taber Anderson – Cross

1   *Q.*  You can pull up a photograph in approximately one second

2   from a license plate, can you not?

3   *A.*  No, not from a license plate.

4   *Q.*  From a name?

5   *A.*  If I have a name and a date of birth, I wouldn't say one

6   second.  It takes me the time to look at the name, especially a

7   two-part last name -- I've never seen Euresti before -- confirm

8   the spelling, get the date of birth, go to the screen where I

9   can type in a person, type in that name, and then go through

10  their query results for DMV stuff, get their license photo,

11  check for warrants, stuff like that.  So it's not one second by

12  any means.  It's probably 30 seconds to get that information.

13  *Q.*  Do you every use alternative ways of verifying a person's

14  identity?

15  *A.*  Sure.

16  *Q.*  Like, you carry an iPhone?

17  *A.*  Yes.

18  *Q.*  For the fun of it, I put Christopher Vazquez-Euresti in my

19  phone and pulled up a photo of him in one second.  Do you ever

20  use your iPhone to confirm people's identity?

21  *A.*  If I did it on my phone, it would take longer, because I

22  have to open up an app, and then I have to sign in, I have to

23  verify I am who I say I am, and then I have to put all the

24  information in.  And then the app we use is actually pretty

25  slow to load, so it could take a couple of minutes to bring up

Taber Anderson - Cross

1   his photograph on my phone.

2   Q.  Registered sex offender photographs are online.  You're

3   aware of that?

4   A.  Yes, but I never use that information to verify.  We have

5   other police databases that I use to verify, because I can get

6   more information in that manner.  And I don't know by heart any

7   sex offender websites that I can just put the name in

8   immediately and have it up in one second.

9   Q.  At the point in time when Mr. Grant is handcuffed and your

10  gun is drawn on him, you don't have any evidence that he has

11  committed a crime; correct?

12  A.  I had no way to verify identities at that point.  At that

13  point, seeing the license plate, the attempt to locate listed

14  to the license plate.  Typically, that's for the owner of the

15  car.  I believed the driver was going to be our suspect we were

16  looking for.  Because -- it doesn't make sense for me to

17  have -- for instance, it doesn't make sense for me to be the

18  passenger in my car under normal circumstances and have

19  somebody drive me around in my car anywhere.

20  Q.  At the point in time that you had him in handcuffs and you

21  had your gun drawn on him, Mr. Vazquez-Euresti had said to you,

22  "I'm Chris"; correct?

23  A.  Right.

24  Q.  And Mr. Vazquez-Euresti was the Hispanic man of the two

25  men; correct?

Taber Anderson - Cross

1  *A.*  Correct.

2  *Q.*  And you had not seen -- I understand your thoughts about

3  drivers and cars, but you had not seen Mr. Grant commit a

4  crime; correct?

5  *A.*  No.

6  *Q.*  And you had no reason to believe he was going to commit a

7  crime; correct?

8  *A.*  That's not true.  I -- when we do a high-risk stop, until

9  the officer safety concerns are eliminated, everybody is in

10  handcuffs, and we verify who they are, I have no idea who

11  anybody is.  Verifiably, I have no --

12  *Q.*  You had no reason to believe Mr. Grant was going to commit

13  a crime?

14  *A.*  That's not necessarily true.  I don't know that until my

15  investigation is done with this attempt to locate.

16  *Q.*  And the investigation is identify -- confirming the

17  identity of Mr. Vazquez-Euresti?

18  *A.*  Correct.  That's all -- we had to identify both of them and

19  verify both of their identities.

20  *Q.*  And at that point, instead of verifying identities, you

21  then asked Mr. Grant -- you begin searching him?

22  *A.*  No.  I asked him if he had a weapon and conducted a

23  pat-down.

24  *Q.*  Correct.

25  *A.*  Right.  A pat-down is not a search.

1          MS. STIMSON:  I have no further questions, Your Honor.

2          THE COURT:  All right.  Thank you.

3          Redirect.

4          MR. MINSER:  Thank you, Your Honor.  Briefly.

5                       **REDIRECT EXAMINATION**

6   BY MR. MINSER:

7   Q.  Agent Anderson --

8   A.  Yes.

9   Q.  -- you were asked some questions about the domestic

10  violence ATL part.

11  A.  Right.

12  Q.  Do you have any information that the domestic violence and

13  the felony menacing are even related?

14  A.  Yes.  It says DV felony menacing charges, so that would

15  mean that the crime of felony menacing was committed against an

16  intimate partner, is the information.

17  Q.  Okay.

18  A.  That's what that indicates to me from the ATL hit.

19  Q.  But you had no details about that; correct?

20  A.  Correct.  I just had what was on the ATL.

21  Q.  Again, you were talking generally about your training and

22  experience about DVs and felony menacing.  It's fair to say

23  that there could be a number of circumstances involving DVs and

24  felony menacing involving more than one people -- more than one

25  person.  I'm sorry.

Taber Anderson – Redirect

1   *A.*   Correct.

2   *Q.*   The sex offender portion of the ATL, did that ever come up

3   on your screen?

4   *A.*   Like I said, I don't recall at what point it did.  It would

5   have on scene.  I just don't recall if it was before the ATL or

6   after.  If it was before, like I said, the higher priority was

7   still that red blinking light told me there was officer safety

8   concerns.

9   *Q.*   My point is, you weren't really able to look at that?

10  *A.*   Correct.

11  *Q.*   Based on the circumstances?

12  *A.*   Correct.

13  *Q.*   That being said, you indicated that there was, you know, a

14  denotation on there about a Hispanic background; correct?

15  *A.*   On the sex offender registration, there was.

16  *Q.*   But, again, you also mentioned that if you have that, it

17  doesn't necessarily mean you can't be black; correct?

18  *A.*   Correct.

19  *Q.*   After the defendant -- how long was the defendant

20  handcuffed before you discovered the extended mag?

21  *A.*   That was pretty quick.  Maybe 30 seconds, somewhere in

22  there.

23          *MR. MINSER:*  Nothing further, Your Honor.

24          *THE COURT:*  Thank you.

25          Anything further, Ms. Stimson?

Robert Albrets - Direct

1          *MS. STIMSON:*  No.

2          *THE COURT:*  May this witness be excused?

3          *MR. MINSER:*  Yes, Your Honor.

4          *MS. STIMSON:*  Yes, Your Honor.

5          *THE COURT:*  All right.  Agent Anderson thank you.  And

6    you're free to go.

7          *THE WITNESS:*  Thank you.

8          *THE COURT:*  You're excused.

9          Call your next witness.

10          *MR. WARHOLA:*  Your Honor, the people would call

11   Detective Rob Albrets.

12          *THE COURT:*  All right.

13          Good morning, Detective.  If you would come over here

14   by the witness stand.  Ms. Myhaver will swear you in.

15          (**ROBERT ALBRETS, GOVERNMENT'S WITNESS, SWORN**)

16          *COURTROOM DEPUTY:*  Thank you, be seated.

17          Please state your name and spell your first and last

18   name for the record.

19          *THE WITNESS:*  My name is Robert Albrets.  First name

20   is R-O-B-E-R-T.  Last name is A-L-B-R-E-T-S.

21          *THE COURT:*  All right.  Counsel, you may inquire.

22          *MR. WARHOLA:*  Thank you, Your Honor.

23                         **DIRECT EXAMINATION**

24   *BY MR. WARHOLA:*

25   *Q.*  Good morning, Detective Albrets.  What do you do for a

Robert Albrets - Direct

1   living?

2   *A.*   I'm a detective for the Lakewood Police Department.

3   *Q.*   How long have you been a detective with the Lakewood Police

4   Department?

5   *A.*   I've been a detective for several months, since May of this

6   year.

7   *Q.*   Prior to that, what was your position at Lakewood PD?

8   *A.*   I was a patrol agent since 2006.

9   *Q.*   Fair to say roughly 15, 16 years of law enforcement

10  experience?

11  *A.*   Yes, sir.

12  *Q.*   I would like to draw your attention to a specific date and

13  time, July 28 of last year, 2021, around 9:51 p.m. in the

14  evening.  Were you working that night?

15  *A.*   I was.

16  *Q.*   What was your shift that day?

17  *A.*   At the time I was working on what we call the swing shift.

18  It's a patrol shift that goes from 3:00 p.m. to 1:00 a.m.

19  *Q.*   At that time at 9:51 on July 28 of 2021, did Agent Anderson

20  call out or air out a suspicious vehicle at that time?

21  *A.*   He did.

22  *Q.*   Do you recall roughly where you were when you heard

23  Agent Anderson air that out?

24  *A.*   As I recall, I was in my car, in the area of West 10th

25  Avenue and Wadsworth Boulevard.

Robert Albrets - Direct

1  *Q.*  Do you know roughly how far away that is from the Mesa

2  Motor Inn?

3  *A.*  In terms of miles, I couldn't say.  It's about five blocks

4  south and twenty blocks west of, roughly.

5  *Q.*  Okay.

6  *A.*  But a mile or two.

7  *Q.*  Do you recall what the information was that Agent Anderson

8  had radioed out?

9  *A.*  I do.  So he aired out a suspicious vehicle and provided

10  license plate and noted that there was an attempt to locate on

11  that vehicle and that it was occupied twice, two by people.  I

12  think he also added that the ATL was -- referenced a felony

13  menacing DV suspect.

14  *Q.*  Did he air out where he was?

15  *A.*  He did.

16  *Q.*  Where was that?

17  *A.*  5600 West Colfax Avenue, the Mesa Motor Inn.

18  *Q.*  Upon hearing that information, what did you do?

19  *A.*  Dispatch called me to assist, and I started driving that

20  direction.

21  *Q.*  How long did it take you to get to the Mesa Motor Inn from

22  where you were?

23  *A.*  I think roughly about two minutes.

24  *Q.*  Are you familiar with that area?

25  *A.*  I'm very familiar with it.  It was my assigned patrol area

Robert Albrets - Direct

1   for several years.

2   Q.   Okay.  Is that a high crime area?

3   A.   It is.

4   Q.   You estimated -- you said -- you testified a few minutes

5   ago -- or maybe a minute ago -- that it took you about two

6   minutes to arrive on scene.  Do you mind describing the scene

7   when you first arrived.

8   A.   Sure.  So I can't remember the exact route I took; but

9   while I was still en route, Agent Anderson aired -- telling me

10  to come in from the Colfax entrance.  The motel has two

11  entrances, one off of Depew Street, one off of West Colfax Ave.

12  So I came in the Colfax Ave entrance, which it's a little hard

13  to describe.  But, essentially, when you pull off of Colfax in

14  the parking lot, you can't see into the parking lot until

15  you're basically in it.  You drive into, like, a little tunnel

16  into the central parking lot.

17  Q.   I don't mean to interrupt you.  I'm going to show you what

18  has previously been admitted as Government Exhibit 2 on the

19  screen, you should see there.

20  A.   It's thinking about it.

21  Q.   Yeah.

22  A.   Okay.

23  Q.   Do you see Exhibit -- Government's Exhibit 2 up there?

24  A.   I do.  Looks like an aerial Google Map type view of the

25  Mesa Motor Inn.

Robert Albrets - Direct

1   *Q.*  Do you mind describing for the Court -- there should also

2   in the binder there be a hard copy of Government Exhibit 2, as

3   well.

4   *A.*  Okay.

5   *Q.*  Do you mind, if you can, holding up to the Court to show

6   which entrance you came into for the Mesa Motor Inn?

7   *A.*  Sure.  So if -- if this is West Colfax Avenue, this is

8   Depew Street, the entrance I came into was right here on the

9   north side of the motel.  Right off of Colfax.

10  *Q.*  Perfect.  Thank you.

11  *A.*  Uh-huh.

12  *Q.*  You testified that you couldn't see -- you can't see into

13  the parking lot coming off of Colfax Avenue the way that you

14  did; correct?

15  *A.*  That's correct.  You can't see it until you're in it,

16  basically.

17  *Q.*  Do you keep driving into the parking lot as you enter into

18  the complex?

19  *A.*  Yes.  So I passed -- I turned off of Colfax into the

20  parking lot.  I drove through the tunnel where the office is

21  right at the beginning; and the minute I turned in, then I

22  could see a little of what was going on.  And what I saw was

23  Agent Anderson's marked patrol car with the lights going.  And

24  I came up, like, from the back of his car; so his car was

25  facing south.  And beyond his car I could see there was a white

Robert Albrets – Direct

1   Ford Fusion that was nosed in in a parking spot, with the nose

2   of the car facing west.  And there were two people that were

3   laying face down on the ground between the front of

4   Agent Anderson's car and what would have been the passenger

5   side of the white Ford Fusion.

6   Q.  So both -- so there is two people on the ground.  Where --

7   and you said -- where is Agent Anderson exactly?

8   A.  So he's standing, like, at the driver's door of his patrol

9   car.

10  Q.  Okay.  What is he doing?

11  A.  He's got these two people at gunpoint, and he was in

12  contact with them.

13  Q.  Okay.  I think you testified you pulled up close to

14  Agent Anderson's vehicle -- patrol vehicle; is that right?

15  A.  Yeah.  There was sufficient room on the passenger side of

16  his car for me to pull up sort of next to his, which is what I

17  did.

18         MR. WARHOLA:  Okay.  If we could pull up Government 4.

19  BY MR. WARHOLA:

20  Q.  I just want to show you what has already been previously

21  admitted as Government Exhibit 4 there.  Do you see the police

22  lights in the background of that exhibit?

23  A.  I do.

24  Q.  Are you able to decipher whose patrol vehicle is on there?

25  A.  Yes.

Robert Albrets - Direct

1   *Q.*  Which one is which?

2   *A.*  So if you look at -- I can hold it up if you like.  But if

3   you look on the right side of the picture, that would be --

4   *Q.*  If you could show the Court.

5   *A.*  -- that patrol car, that's Agent Anderson's.  The one to

6   left of that, that's mine.

7   *Q.*  Thank you.  Now, when you first get there, park your

8   vehicle, what do you do?

9   *A.*  First, I kind of oriented myself.  And I saw, again, that

10  Agent Anderson looked to me to be in the middle of what we call

11  a high-risk vehicle stop.  We do these a lot.  So when I pulled

12  up, I said, okay, he's got two occupants that are cooperative,

13  and they're both laying in the prone, face-down position on the

14  ground.  At that point the next step tactically is to move up,

15  clear the car, and detain the two people that are on the

16  ground.  So we immediately started doing that, where I got out

17  of my patrol car, we moved up, checked the car, detained the

18  two people.

19  *Q.*  Before you get out, are you checking anything internally in

20  your system inside your patrol vehicle?

21  *A.*  No.

22  *Q.*  So you just literally park and get out immediately?

23  *A.*  Park, get the lights on, get out.  Yep.

24  *Q.*  Not to jump back here, but prior to arriving on the scene,

25  did you hear Agent Anderson air any information?

Robert Albrets - Direct

1    A.  I did.  So very quickly after I was dispatched and started

2    driving that direction, I heard Agent Anderson say he had two

3    at gunpoint.  I also heard him ask for further descriptors of

4    the person -- the subject of the ATL, which I don't think

5    dispatch was able to provide anything beyond, like, a name.

6    Q.  Okay.  Did you ever hear Agent Anderson air out any

7    information regarding the identity of either of those two

8    individuals?

9    A.  If I recall, he aired something along the lines of one

10   person said they were Chris, something to that effect.

11   Q.  Did you ever see this attempt to locate for the individual

12   later identified as Christopher Vazquez-Euresti?

13   A.  I did see it.  I don't remember if I took the time to run

14   that plate on my own MDT or not.  I don't remember.

15   Q.  When would you have seen this?  Is this en route to the

16   Mesa Motor Inn?

17   A.  Yes.  If I had ran it on my MDT unit -- and I don't recall

18   if I did or not -- then I would have seen it on the way.  But I

19   wouldn't have taken a whole lot of time to comb through it.  I

20   definitely saw it after they were detained and things had

21   settled down.

22   Q.  You mentioned that you heard Agent Anderson asking for

23   physical descriptors.  Did you ever see any physical

24   descriptors in the ATL yourself?

25   A.  No.  The ATL itself did not contain -- beyond a name, date

Robert Albrets - Direct

1   of birth, and address didn't contain anything like height,

2   weight, hair color, eye color, none of that.

3   Q.  All right.  So you testified you arrive on scene, you

4   observe what is going on, and get out of your patrol vehicle

5   right away.  Where do you go, and what do you do at that point?

6   A.  Agent Anderson and I linked up, and we moved up, and we

7   detained first one person, then moved to the next one.  And I

8   can't remember if we checked inside the car before we detained

9   them or immediately afterwards, but we also checked inside the

10  car at some point.

11  Q.  Why are you checking the car?

12  A.  It's standard practice in a high-risk vehicle stop.  The

13  concern is that, while we have two people who are cooperative

14  on the ground to deal with, there is also the unknown, if there

15  is another person or persons that are hiding in the vehicle or

16  have refused to come out of the vehicle.  That presents an

17  officer safety concern.  For example, you don't want to be

18  handcuffing or searching somebody on the ground when suddenly

19  you're attacked from behind or somebody goes running you didn't

20  know what there, or something like that.

21  Q.  During this time, is your weapon drawn, as well?

22  A.  Yes.

23  Q.  When do you do that?

24  A.  Right at the time I'm getting out of my car.

25  Q.  And you mentioned -- you testified that you and

Robert Albrets - Direct

1   Agent Anderson linked up.  You kind of held your pointer finger

2   and middle finger together.  What do you mean by that?

3   *A.*  I mean, we literally walked to stand next to each other;

4   and then we continued up as a pair, like, side by side.

5   *Q.*  Why do you do that?

6   *A.*  We do that because the next step in the process -- again,

7   we check the car; but we also then physically handcuff the two

8   people that are on the ground.  And the way we're trained to do

9   that is you do it in a pair so that one person is responsible

10  for actually handcuffing the subject.  The other one is there

11  to assist or to watch everything else for the safety so the

12  person handcuffing can focus on the handcuffing.

13  *Q.*  Do you recall which individual you handcuffed first?

14  *A.*  We didn't know who was who at the time.  But ended up, we

15  handcuffed Chris Vazquez-Euresti first.

16  *Q.*  Did you know who was the driver in the driver's seat and

17  who was in the passenger seat at that point?

18  *A.*  I did not, as they were both out of the car when I showed

19  up.

20  *Q.*  Understood.  So who actually places Mr. Vazquez-Euresti in

21  handcuffs?

22  *A.*  I believe I did.

23  *Q.*  What is Agent Anderson doing at this time?

24  *A.*  He would have been covering me.  But, again, I'm not

25  100 percent.  He might have cuffed up Mr. Vazquez-Euresti while

1    I covered him.  I don't recall 100 percent.

2    Q.  Do you mind explaining the arresting process to the Court?

3    A.  Sure.  So, essentially, at that point, we're going to

4    detain people with handcuffs.  There is a tactic we do when

5    somebody is on the ground compliant, where we'll leave them on

6    the ground while we put them in handcuffs.  And while one

7    person is putting handcuffs on them, the second person is

8    acting as sort of like their safety person or their cover

9    person, is what we call it, where they're watching the other

10   person make sure they don't hop up and start running or

11   fighting.  They're watching to see if somebody else is going to

12   come around.  They're watching to see if this person starts

13   fighting with your partner, things like that.

14           So what it looks like is, one officer is kind of

15   kneeling down, putting handcuffs on someone, while the other

16   officer is standing there right next to him, watching.

17   Q.  At that point do you ever pat down Mr. Vazquez-Euresti?

18   A.  So, yes, we do.  Our common practice is that we will -- in

19   a high-risk vehicle stop like this, where people are compliant,

20   we'll handcuff a person; do a brief pat-down for weapons while

21   they're still on the ground; and then we'll stand them up, move

22   them over to, you know, a patrol car or have them sit on the

23   curb or do something else.

24   Q.  Is that what you did in this case?

25   A.  Not exactly.  And the reason for that was because there

Robert Albrets - Direct

1   were two persons and only two police agents.  So we handcuffed

2   Christopher Vazquez-Euresti first.  And then immediately before

3   doing really a pat-down or anything, other than just a quick

4   back waistband check, we immediately moved -- and that's when

5   Agent Anderson handcuffed Mr. Grant.  Once Mr. Grant was

6   secured in handcuffs, that's when I stepped back, you know, a

7   couple of feet away.  And that's when I did an actual pat-down

8   on Mr. Vazquez-Euresti.

9   Q.  You mentioned, Detective Albrets, before moving to arrest

10  Mr. Grant that you just did a back waistband check of

11  Mr. Vazquez-Euresti.

12  A.  I believe so, yes.

13  Q.  Why did you do that?

14  A.  We are taught pretty early on that just because someone is

15  handcuffed behind their back, it doesn't not mean that they

16  wouldn't be able to resist or hurt someone.  Essentially, the

17  concern is that if someone -- say they have a gun or a knife in

18  their back waistband, they would still be able to access that

19  and use that even with their hands cuffed behind their lower

20  back.

21  Q.  Now, when you go from Mr. Vazquez-Euresti to Mr. Grant, do

22  yours and Agent Anderson's roles reverse?  Whereas, you had

23  mentioned that you arrested Mr. Vazquez-Euresti while

24  Agent Anderson was standing cover; and then does Agent Anderson

25  then effect the arrest of Mr. Grant while you stand as cover?

Robert Albrets - Direct

1  *A.*  So I -- I don't remember 100 percent if I was the one who

2  put handcuffs on Mr. Vazquez-Euresti.  I believe I was, but I

3  don't remember specifically.  But I do remember that

4  Agent Anderson was the one that physically handcuffed Mr. Grant

5  while I covered him.

6  *Q.*  Okay.  And during Agent Anderson's arrest of Mr. Grant, is

7  there a pat-down or frisk, as well, of him?

8  *A.*  Yes.  Conducted by Agent Anderson.

9  *Q.*  Once Mr. Grant is then placed into handcuffs, where do you

10  go, and what do you do at that point?

11  *A.*  So once Agent Anderson handcuffed Mr. Grant, who was still

12  on the ground, I stepped back to do the full pat-down on

13  Mr. Vazquez-Euresti.  I didn't find anything on him, no

14  weapons, no contraband, nothing really of any note.  So then I

15  stood him up and walked him back to the front of the patrol

16  cars -- or had him kind of sit or lean against the front of

17  Agent Anderson's patrol car.  At that point I turned to look

18  back and check on Agent Anderson.  And that's when I saw that

19  there was a very large extended pistol magazine on the ground

20  next to them that had not been there before.  And I continued

21  to watch as Agent Anderson was able to remove a pistol from,

22  like, the lower leg of Mr. Grant.

23  *Q.*  Prior to turning around and observing this, did you know

24  who the subject of this ATL was between these two individuals?

25  *A.*  No.

Robert Albrets - Direct

1    Q.   At this point?

2    A.   No.

3    Q.   Okay.  So you're looking, you turn back, observe

4    Agent Anderson grabbing a pistol as well as an extended mag,

5    you mentioned, from Mr. Grant's -- from there, what do you do?

6    A.   So I did a more thorough search of Mr. Vazquez-Euresti and

7    asked him specifically about weapons.  I think he told me he

8    had a knife in the car; but, again, I didn't find any weapons

9    on him.

10          Then after Agent Anderson had completed his pat-down

11   and removed the gun and the magazines from Mr. Grant, I took

12   him back and put him in the back of Agent Anderson's --

13   Mr. Grant, I took him back and put him in the back of

14   Agent Anderson's patrol car.

15   Q.   Okay.  So just to be clear, you take Mr. Vazquez-Euresti,

16   put him in the back of your patrol vehicle, and then go get

17   Mr. Grant and put him in the back of Agent Anderson's --

18   A.   I don't know if I put Mr. Vazquez-Euresti in the back of my

19   car or if he was just still standing on the bumper of

20   Agent Anderson's -- we had other officers coming at that point,

21   too.

22   Q.   Understood.  Do you recall at what point other officers

23   arrive on scene?

24   A.   Within a few minutes.

25   Q.   Okay.  Do you know -- speaking of that, do you know roughly

Robert Albrets - Direct

1    how long the time span was -- time frame, I should say --

2    between you arriving on scene and the time that Mr. Grant and

3    Mr. Vazquez-Euresti were placed into handcuffs?

4    A.  I'd say they were placed into handcuffs within 30 seconds

5    or a minute of myself arriving on scene.

6    Q.  At some point do you get Mr. Grant's name and date of

7    birth?

8    A.  Yes.  So sometime around when I took him and put him in

9    Agent Anderson's patrol car, I asked for his name, date of

10   birth, which he provided verbally.  And then a little bit

11   later, upon a full search incident to custodial arrest is when

12   I located several photo IDs that he had on his person to verify

13   his -- the identity he provided verbally.

14   Q.  Where do you conduct this search incident to arrest?

15   A.  Just next to Agent Anderson's patrol car.  So I put him in

16   there after he had been patted down but hadn't had a full

17   search -- well, not by me.  And then later when I made

18   determinations that he was a convicted felon on his history,

19   that's when I brought him out of Agent Anderson's patrol car

20   and did the full custodial search incident to arrest.

21   Q.  Okay.  Was it at that time that you were able to confirm

22   his identity?

23   A.  Yeah.  The government-issued IDs were sort of the final

24   confirmation.  After he provided verbal identifying

25   information, I ran that on one of the MDTs, the computers.  And

Robert Albrets – Direct

 1  that will bring back like a DMV record with a photo and a

 2  physical description.  And that's a pretty good for ID.  Not

 3  nearly as good as having someone having a government-issued ID

 4  with them, but -- so the government-issued ID really confirm

 5  what he had already provided.

 6  *Q.*  So you're pretty much able to confirm it based on his

 7  verbally giving the name and date of birth and then verifying

 8  that on the system in your patrol vehicle?

 9  *A.*  Yeah.  Typically, we'd like to have an actual photo ID, is

10  the absolute best identifying we can have.

11  *Q.*  How much time would you say, Detective Albrets, had passed

12  between Mr. Grant and Mr. Vazquez-Euresti being detained and

13  the time that you were able to verify at least Mr. Grant's

14  identity?

15  *A.*  I would estimate maybe five or ten minutes.  That would be

16  from when he is detained to when we are getting the

17  government-issued photo IDs.

18  *Q.*  At what point was Mr. Vazquez-Euresti's identity verified?

19  *A.*  Again, it would have been a few minutes after being taken

20  into custody.

21  *Q.*  Were you involved in that process, or was that

22  Agent Anderson?

23  *A.*  I was involved in that, I think.

24  *Q.*  Okay.

25  *A.*  Agent Anderson was still searching Mr. Grant at that time.

Robert Albrets - Direct

1  *Q.*  Do you recall how you verified Mr. Vazquez-Euresti's

2  identity?

3  *A.*  I don't.  I know we did run him on DMV and CCIC/NCIC, but I

4  don't remember if we had a photo ID on him or not.

5  *Q.*  Understood.

6         If I may have a moment, Your Honor, please?

7         *THE COURT:*  Yes.

8         *MR. WARHOLA:*  Thank you.

9  *BY MR. WARHOLA:*

10 *Q.*  Just one clarifying question, Detective Albrets.  When you

11 say -- when we're talking about after arrest, are you talking

12 about after being detained in handcuffs?

13 *A.*  For?

14 *Q.*  For when you were able to verify their identity?

15 *A.*  Right.  So, essentially on a high-risk stop, we're going to

16 detain people with handcuffs.  That's primarily driven by

17 officer safety.  And at some point later, I would say

18 Mr. Grant -- specifically when they found -- when

19 Agent Anderson found, like, an extended capacity pistol

20 magazine and then a pistol, you know, now, we can say, okay,

21 he's gone from being detained to being under arrest because now

22 we have some probable cause for certain crimes here.  But I

23 wouldn't have considered him in my own mind to be under full

24 custodial arrest until after we verified that he was a

25 convicted felon, because now that brings me into probable cause

Robert Albrets - Cross

1    for a charge.

2    Q.  During your time on scene, prior to verifying the

3    identities of both Mr. Vazquez-Euresti and Mr. Grant, did they

4    ever make any statements about their identity as they were

5    lying on the ground?

6    A.  Not in my presence.

7    Q.  Okay.  Did you ever -- did you ever ask them any questions

8    about their identity or Agent Anderson ask them any questions

9    about their identity in your presence?

10   A.  Not that I recall.

11   Q.  I'm talking to about prior to you verifying them.

12   A.  Not that I recall.

13           MR. WARHOLA:  That's all I have, Your Honor.  Thank

14   you.

15           THE COURT:  All right.  Cross-examination,

16   Ms. Stimson.

17           MS. STIMSON:  Thank you, Your Honor.

18                        **CROSS-EXAMINATION**

19   BY MS. STIMSON:

20   Q.  Good afternoon -- good morning, still, Detective.

21           Your role in this was arriving and helping

22   Agent Anderson; correct?

23   A.  Yes.

24   Q.  He was already in the situation when you got there?

25   A.  He was.

Robert Albrets - Cross

1    Q.  And the last question the prosecutor was just asking you --

2    one of the last was, you didn't hear them have a discussion

3    about identity.  That happened before you got there?

4    A.  You mean Agent Anderson asking --

5    Q.  The two men who were laying on the ground.

6    A.  Right.  No.  That was before I arrived.

7    Q.  And you also didn't do any of your own investigation about

8    the identity of the person with the warrant before you arrived?

9    A.  Correct.

10   Q.  He was already in this situation, and you simply came to

11   help?

12   A.  Yes.

13   Q.  We kept using the term -- or we have been using the term

14   "high-risk traffic stop."  I want to talk about that for a

15   second.

16          The reason it was a high-risk traffic stop is because

17   there was a man who had a warrant for his arrest and because

18   that warrant was a domestic violence menacing; is that correct?

19   A.  Well, to clarify, I think there was a warrant.  But at the

20   time we were only made aware of the attempt to locate, which

21   was not itself an arrest warrant.  It was a CCIC/NCIC alert put

22   on the vehicle.

23   Q.  Got it.

24   A.  So, yeah, I think it ended up -- it did have a warrant, but

25   I don't know if that was known to us at the time.

Robert Albrets - Cross

1   Q.  So it was a high-risk traffic stop because it was an

2   attempt to locate -- which means, to people who aren't super

3   familiar with that term, a man who is wanted or a -- find this

4   suspect who has a good domestic violence menacing charge out

5   there?

6   A.  Yeah.  The ATL had asterisk, says, officer safety.  Then it

7   says -- I can't remember the exact verbiage.  Says Thornton has

8   good DV felony menacing charges on this person with this

9   vehicle.  If located, detain and contact Thornton PD.

10  Q.  That, then, triggers for police officers that that's a

11  high-risk traffic stop?

12  A.  Essentially, the tactics are going to up to the individual

13  agency or people responding.  In my training and experience

14  with Lakewood Police Department, we would approach that as a

15  high-risk vehicle stop or high-risk vehicle contact -- however

16  you want to say it -- because specifically for the mention of

17  felony menacing.

18  Q.  And that is high risk because it involves a weapon?

19  A.  Yes.  Typically involves a deadly weapon.

20  Q.  Correct.

21  A.  It wasn't specified on the ATL; but in my experience

22  that's -- felony menacing is typically going to mean a gun --

23  Q.  Or a knife?

24  A.  A knife, yeah.

25  Q.  Hammer?

Robert Albrets – Cross

1   *A.*  Be a little creative.  Something that could be used as a

2   deadly weapon.

3   *Q.*  Okay.  But it's looking for one person; correct?

4   *A.*  On the ATL?  Yes.

5   *Q.*  Yes.  And so then when the officer initiates this high-risk

6   traffic stop, they're looking for the one person; correct?

7   *A.*  Yes.

8   *Q.*  And it's then the purpose to investigate and figure out

9   which is the person; correct?

10  *A.*  Correct.

11  *Q.*  And you agree that it's not a crime to be with a person who

12  is wanted?

13  *A.*  No.

14  *Q.*  So the objective is to figure out which one it is and then

15  the other one gets to go free; correct?

16  *A.*  Assuming you don't stumble onto something else to detain

17  the other person for.  You know, for example, if we go to

18  contact a vehicle, and I say, Hey, driver you're the one I

19  want.  Oh, passenger, you have a big pile of cocaine on your

20  lap.  You're not going to walk away.  Sorry.

21  *Q.*  Correct.  And when you don't see other things like that,

22  then the other person walks away?

23  *A.*  Yeah, once a reasonable amount of time has passed or a

24  reasonable investigation has been done, I suppose.

25  *Q.*  And the objective is to investigate and then arrest, not

Robert Albrets - Cross

1   arrest and then investigate?

2   *A.*  Ultimately yeah.  I mean, the standard for arrest is

3   probable cause.  An ATL is a little funny, because I'm not

4   privy to the details of their case.

5   *Q.*  Correct.

6   *A.*  So, essentially, what we're talking about is kind of a

7   lawful arrest, where it's on good faith of another law

8   enforcement agency.  So based on ATL, we would detain the

9   subject of the ATL without knowing anything about the case.

10  *Q.*  Correct.  And something just -- that you had testified to

11  right at the very end that I wanted to clarify.  When you

12  arrived, both men were detained?

13  *A.*  Not with handcuffs.  They were proned out at gunpoint.

14  *Q.*  They were not free to leave?

15  *A.*  No, they were not free to leave.

16  *Q.*  They were laying on the ground with a gun pointed at them?

17  *A.*  Correct.

18  *Q.*  And they stayed that way until both you and the other --

19  Agent Anderson made individual contact.  I mean, they didn't

20  get up; they weren't free to leave at any point in the middle

21  of that; they stayed detained?

22  *A.*  They did.

23          *MS. STIMSON:*  Thank you.  I have no further questions.

24          *THE COURT:*  All right.  Any redirect?

25          *MR. WARHOLA:*  No, Your Honor.

1        *THE COURT:*  Is this witness free to go?

2        *MR. WARHOLA:*  Yes.

3        *THE COURT:*  All right.  Detective, you are free to go.

4   Thank you.

5        *THE WITNESS:*  Thank you.

6        The at this point, I'll take any brief arguments that

7   counsel would like to make.

8        Start with you, Mr. Minser.

9        *MR. MINSER:*  Thank you, Your Honor.

10       Your Honor, I'll be brief because I think I've laid

11  out most of our argument in our response.

12       I do think the *Lang* case dictates how this case is

13  factually.  They just don't know who they're dealing with on

14  scene; and they have reason to believe the driver, Mr. Grant,

15  is the guy they're looking for.  Because of that, they're

16  taking extra precaution, because, again, based on the

17  information they have, they think he could be armed.  It's

18  basic officer safety principles.

19       I understand that the passenger identified himself,

20  and he was being honest.  But, again, as *Lang* says

21  specifically, officers don't have to take that at face value.

22  They don't have to believe that.  What they have to do is

23  confirm it.  And in this case, they did.  They confirmed it,

24  but it was after probable cause was established.

25       Your Honor, that's just the reasonable suspicion

1    aspect here.  We also have the felony arrest aspect.  Even

2    assuming the defense argument is right, even assuming

3    Mr. Euresti was identified, the defendant is in the immediate

4    adjacent area to him.  That makes him subject to a protective

5    detention.  And based on the circumstances, Your Honor, of

6    there being a weapon involved, of the defendant being the

7    driver of Mr. Euresti's car, that gives law enforcement the

8    right to take extra precautions in that situation.  Not only

9    detain, but to handcuff and ask him if he's got weapons.  And

10   when he says he's got a weapon, they can pat him down and find

11   the weapon.

12           Your Honor, that's the issue here, really.  We have 30

13   seconds.  The defendant is handcuffed at the point they get

14   probable cause to arrest, which is the extended magazine.  That

15   is not unreasonable, that is entirely reasonable based on the

16   circumstances, and the Government would ask that you deny the

17   motion.  Thank you.

18           *THE COURT:*  Thank you.

19           Ms. Stimson.

20           *MS. STIMSON:*  Thank you, Your Honor.

21           I would like to start by distinguishing the *Lang* case

22   to these facts.  The suspects in the *Lang* case were suspects in

23   an armed robbery that I believe had just occurred, unlike here.

24   That was a three-day old domestic violence incident that caused

25   them to worry that someone was armed and dangerous, because of

1      a three-day old domestic violence incident.  It's a completely

2      different situation.

3              And I think that the Government is pushing or mashing

4      together facts that need to be separated apart.  Mr. Grant was

5      sitting in the driver's side of Mr. Vazquez-Euresti's car, and

6      that car had an active warrant from three days ago attached to

7      it.  They had reasonable suspicion, and it was constitutionally

8      appropriate for him to order him out of the car.  Excessive, at

9      gunpoint and order him to lay on the ground and point a gun at

10     his head?  Yes.  But not unconstitutional, which is why we have

11     not raised it.  At that point, they cannot create an officer

12     safety issue.

13             They had time to apparently -- they didn't --

14     Agent Anderson did not read all of the information available to

15     him that he could have read.  He could have known so much

16     information about Mr. Vazquez-Euresti.  And if in reality he's

17     worried about his officer safety and not just using it after

18     the fact to justify an unconstitutional arrest and search, but,

19     in fact, was concerned about it, he would have used the minutes

20     or seconds or whatever it is to look additionally at which one

21     is Mr. Vazquez-Euresti?  Who is it that I'm going to arrest

22     right now?  Because that's my job here, is to arrest the person

23     that is wanted.  My job isn't to order people out of cars who

24     are doing nothing and order them to lay on the ground and point

25     guns at their head.  One of them needs to be arrested, which

1    one is it?

2            Investigate and then arrest.  That's what the

3    Constitution requires.  And he didn't do that.  But even in

4    looking at the man's name, he can determine, this may be a

5    Hispanic man.  Now, of course, are there people who are black

6    who have Hispanic names?  Yes.  But at that point he orders

7    them out, they're both laying on the ground being compliant.

8    And he then asks, "Which one of you is Chris?"  And at that

9    point, the man who appears Hispanic with -- confirms that he's

10   the person that they're looking for.  And that's the point when

11   reasonable suspicion for Mr. Grant is over.  There is nothing

12   at that moment in time of being in the car, owned by a person

13   who is wanted -- Mr. Grant has done nothing else wrong.  That's

14   the point where the officer says, you can leave.  You are free

15   to leave.  I have no further reasonable suspicion, and I

16   certainly have no reason to believe that you're presently armed

17   and dangerous at this point in time.

18           Yes, it happened quickly.  But there was also time

19   while they're pointing guns at them and they're being

20   compliant, when the other arrives.  And if they want to

21   triple-check Mr. Vazquez-Euresti's identification, there is

22   time at that point, too, for one of the officers to

23   triple-check his identification so as to not violate the

24   constitutional rights of the other man.

25           Case law says that the investigative methods must be

1    the least intrusive means available to verify or dispel the

2    suspicion.  And when there is use of force, it's a far greater

3    level of intrusion and requires the government to demonstrate

4    the facts available to the officer would warrant a man of

5    reasonable caution that the action taken was appropriate.  So

6    at that point when he's down on the ground with a gun pointed

7    at him, and the other one has said, I'm the one you're looking

8    for, and that seems consistent with the information that they

9    have made available to themselves, it therefore becomes

10   unreasonable for them to walk over to him and then handcuff him

11   and then search him.

12          And then after they have handcuffed him, searched him,

13   that's when they start verifying identifies.  Officer safety

14   was created in this issue and was not necessary, given the

15   facts in the case.

16          In order for them to have continued -- and this is the

17   *De La Cruz* case cited in our brief -- in order for them to have

18   gone past the initial detention when reasonable suspicion was

19   over, when Mr. Euresti identified himself, they needed another

20   layer of reasonable suspicion to continue that investigative

21   detention.  But I think it comes -- it -- something underlying

22   all of this is that this was a high crime area, and that is

23   what was going on for these officers.  And the Fourth Amendment

24   protects people who are in high crime areas, just as it

25   protects people who aren't.

 1          And there was not a demonstrated need for that officer

 2   to run up to the car and step -- do this high-risk traffic stop

 3   and order them on the ground and point guns at them and search

 4   them without taking the time to do the investigation that could

 5   have been done prior.

 6          And then that was -- you know, once he did that, there

 7   was an ample opportunity for him to do that investigation if

 8   needed and release Mr. Grant, instead of violating his

 9   constitutional rights the way that they did.

10          So I would request that the Court grant the motion and

11   suppress the evidence unconstitutionally obtained.

12          *THE COURT:*  All right.  Thank you.

13          All right.  The Court appreciates the time and effort

14   that both counsel have put into this and the briefing that was

15   provided to the Court on these issues.  These are important

16   issues, and I certainly understand Mr. Grant's desire to

17   challenge this issue.

18          The Court has heard the testimony of both agents who

19   conducted this stop and search.  As the Court noted at the

20   beginning of this hearing -- and both counsel have conceded --

21   the initial detention is not at issue for purposes of this

22   hearing.  Mr. Grant does concede there was reasonable suspicion

23   for law enforcement to conduct the initial investigatory

24   detention because of the ATL, or the attempt to locate, with

25   regard to Mr. Vazquez-Euresti's association with the Ford

1    Fusion.

2            Likewise, the order for both parties to exit the car

3    is not challenged.  However, based upon the testimony that I

4    have heard today, I also do not find that the investigatory

5    detention and subsequent pat-down of Mr. Grant -- I cannot find

6    that it was not reasonably related in scope to the

7    circumstances that justify the original stop and intrusion in

8    the first place.

9            The key issue is -- one of the key issues was whether

10   or not Agent Anderson had sufficient information to confirm the

11   respective identities of the two passengers of the car at the

12   time he handcuffed Mr. Grant.  There was a report that came in

13   at some time after the detention; however, there was the --

14   only the description later.  The identification was of a

15   Hispanic man around 200 pounds.  Even with a dispute of fact as

16   to whether or not that came before or after the pat-down search

17   of Mr. Grant, the Court cannot find that that descriptor was

18   enough to make the pat-down unreasonable.

19           Again, even adding on the factor that the passenger

20   identified himself as Chris, it is not unusual, as the agent

21   testified, for suspects to -- or even contacts which they make,

22   even if they are not suspects, to lie or misrepresent different

23   factors, including identity.  So the agents were not required

24   to accept the representation with regard to the representation

25   of identity.

1          Furthermore, the notion that the agents must rely on a

2    name as being Vazquez, I think were the roles reversed, one

3    might object to categorizing a suspect just on the basis of a

4    Spanish- or Hispanic-sounding surname.  That also might be

5    suspect there.  So I cannot find that that was unreasonable.

6          Also, the officer has -- the agent has testified that

7    the only information that he had from dispatch at the time was

8    the suspect's date of birth and his name.  What the agent knew

9    based upon his testimony was that the individual was associated

10   with the ATL and he could be armed and dangerous at the time

11   that he handcuffed Mr. Grant.

12         Defense counsel makes much of the fact that this was a

13   domestic violence menacing charge and that somehow that is

14   distinguishable from something such as a bank robbery or some

15   other type of menacing.  The Court finds that it is a

16   distinction without a difference, inasmuch as domestic violence

17   situations can be very violent, and folks who have been charged

18   with domestic violence can and have been proven to be very

19   dangerous in other situations.  And those carrying weapons in

20   those situations also have a propensity.  And we have seen in

21   many other situations where folks who have caused harm to

22   others in domestic situations are also certainly capable of and

23   have caused harm to others in other situations.

24         So I do not think that it follows that simply because

25   this was a domestic violence charge, that this individual did

1    not potentially pose harm or risk of harm to the officers in

2    this situation.

3         It does appear that the briefing poses that this may

4    have been both an investigative and a protective detention.

5    The Fourth Amendment certainly provides the right of people to

6    be secure in their persons, papers, houses, and effects against

7    unreasonable searches and seizures should not be violated

8    pursuant to the United States Constitution, Amendment 4.

9         Once a detention has been deemed to have been legal at

10   its inception, courts look only to whether it was reasonably

11   related in scope to the circumstances which justify the

12   interference in the first place.  That is *Kinzalow*, 236 F.App'x

13   414 at 418, Tenth Circuit, 2007, quoting *United States v.*

14   *Maddox*, 388 F.3d 1356 at 1368, Tenth Circuit, 2004.

15        See also *United States v. De La Cruz*, 703 F.3d 1193 at

16   1196, Tenth Circuit, 2013.  In considering whether an

17   investigative stop is reasonable, we conduct a two-step

18   inquiry, asking first whether the detention was justified at

19   its inception and, second, whether the agent's actions were

20   reasonably related in scope to the circumstances initially

21   justifying the detention.

22        In that regard, this Circuit has concluded that an

23   officer may conduct a pat-down search or frisk if she or he

24   harbors an articulable and reasonable suspicion that the person

25   is armed and dangerous.  *United States v. Hishaw*, 235 F.3d 565

1   at 570, Tenth Circuit, 2000.

2          An investigative detention must be temporary and last

3   no longer than is necessary to effectuate the purpose of either

4   dispelling or confirming the officer's reasonable suspicion.

5   *De La Cruz*, 703 F.3d at 1197.

6          A mistaken premise can furnish grounds for a *Terry*

7   stop if the officers do not know that it is mistaken and are

8   reasonable in acting upon it.  *United States v. Shareef*,

9   100 F.3d 1491, 1505, Tenth Circuit, 1996.

10          In this case, I find that the investigative detention

11   here was temporary and not longer than was reasonably necessary

12   to effectuate its purpose.

13          With regard to protective detention, officers also

14   testified as to a basis for protective detention.  The required

15   level of suspicion required to effect a protective detention

16   varies, however, depending upon the area in which the detention

17   occurs.  Where an individual is in an area immediately

18   adjoining the arrestee, the individual may be placed in

19   temporary protective detention even in the absence of probable

20   cause or reasonable suspicion that the individual poses a

21   threat to the officer's safety.  Again, citing *Maddox*, 388 F.3d

22   at 1362.

23          It is unreasonable to expect officers to stop a

24   pat-down search of a suspect that they reasonably believe may

25   be armed and dangerous simply based on the suspect's

1    unconfirmed statement of his identity.  *United States v. Lang*,

2    81 F.3d 955, 967, Tenth Circuit.

3            In *Lang*, the Tenth Circuit found that while there was

4    a factual dispute about when Douangmala Lang told Officer Mumma

5    he was Joe *Lang*, we do not need to resolve it because there is

6    no question Lang's identity was not confirmed until after the

7    completion of the pat-down search.

8            While counsel attempts to distinguish *Lang* on the

9    basis that the time period and the crime were distinguishable,

10   again, I find that distinction unavailing under these

11   circumstances.

12           The testimony here presented indicates that in

13   response to an inquiry from Agent Anderson, the man in the

14   passenger seat of the car connected to the attempt to locate

15   identified himself as an individual connected to the ATL before

16   Agent Anderson handcuffed the defendant, Mr. Grant, who had

17   been sitting in the driver's seat.  The testimony presented

18   further indicates that Agent Anderson, who at the time only had

19   knowledge of the vehicle's connection to the ATL and the date

20   of birth of the individual connected to the ATL.  Therefore,

21   the Court finds that Agent Anderson was not obligated to accept

22   as true Mr. Vazquez-Euresti's statement regarding his identity.

23           This case is more like *Kinzalow* than *De La Cruz*,

24   unlike in *De La Cruz*, where the Government failed to meet its

25   burden of demonstrating that the totality of the circumstances

1    established articulable reasonable suspicion to believe that

2    De La Cruz was involved in criminal activity after the agents

3    realized he was not Guel-Rivera, 703 F.3d at 1198.

4         Here, Agent Anderson did not have sufficient

5    information about defendant's identity to know he was not

6    Mr. Vazquez-Euresti at the time he handcuffed Mr. Grant.  Like

7    in *Kinzalow*, Mr. Grant was in an area immediately adjoining

8    Mr. Vazquez-Euresti, who was the subject of the ATL, in which

9    case Mr. Grant may be placed in temporary protective detention,

10   even in the absence of probable cause or a reasonable suspicion

11   that the individual poses a threat to officer safety.

12        Additionally, the Court does find that there was a

13   basis for the officers to have a reasonable suspicion that

14   either criminal activity was afoot or that there may be a

15   threat related to Mr. Grant.

16        Defense counsel notes that the fact that this was a

17   high crime area alone is it not sufficient.  That is correct.

18   High crime area alone is not sufficient, and the Tenth Circuit

19   has been clear on that issue.  However, that was not all of the

20   information upon which the agent relied, according to his

21   testimony.

22        In addition, the agent relied on the fact that he

23   received an ATL.  Again, this was a high-risk traffic stop in

24   which he was not able to identify specifically which of the two

25   passengers was associated with the vehicle and the ATL.  Given

1    that uncertainty, along with the fact that the ATL related to

2    an individual with a felony menacing charge, raising a

3    potential for high risk for the officer and potential danger

4    for the officer, there was a reasonable basis to detain and

5    conduct a pat-down search of both passengers.

6           For these reasons, Mr. Grant's motion to suppress

7    evidence is denied.

8           Is there anything further, counsel?

9           MR. MINSER:  Nothing from the Government, Your Honor.

10   Thank you.

11          THE COURT:  All right.

12          MS. STIMSON:  No, Your Honor.

13          THE COURT:  All right.

14          Are there any other matters we need to address?

15          MR. MINSER:  I don't believe so, Your Honor.

16          THE COURT:  Okay.  So we have our pretrial conference

17   coming up here, and I will see you then.

18          All right.  Thank you.  Court will be in recess.

19          Sorry.  Last thing.  Please, make sure that we get the

20   Exhibit 2A into evidence.  Thank you.

21          (Recess at 12:19 p.m.)

22

23

24

25

1                              **I N D E X**

2      **Witness**                                                    **Page**

3          TABER ANDERSON
               Direct Examination By Mr. Minser                    8
4              Cross-examination By Ms. Stimson                    36
               Redirect Examination By Mr. Minser                 61
5          ROBERT ALBRETS
               Direct Examination By Mr. Warhola                  63
6              Cross-examination By Ms. Stimson                   80

7                          GOVERNMENT'S EXHIBITS

8      Exhibit          Offered   Received   Refused   Reserved   Withdrawn

9      2                             12
       4, 5, 6                       24
10     9                             36

11

12

13                         REPORTER'S CERTIFICATE

14          I certify that the foregoing is a correct transcript
       from the record of proceedings in the above-entitled matter.
15
            Dated at Denver, Colorado, this 26th day of December,
16     2022.

17

18                         _Therese Lindblom_

19                         _____
                           Therese Lindblom,CSR,RMR,CRR

20

21

22

23

24

25